# The Southwark Railroad Company *versus* The City of Philadelphia.

### Power of City Councils over railroads in the city.

Streets and roads are public highways under the control of cities and towns, subject to the paramount authority of the Commonwealth.

The constitutional provision against laws impairing the obligation of contracts discussed.

BILL in equity for injunction.

This was a proceeding in equity for an injunction to restrain the city of Philadelphia from removing the track of the City Railroad on Broad street from Vine to South street. It was alleged that its removal would inflict "grievous and irreparable injury" upon the Southwark Railroad Company, whose track connected with that of the City Railroad.

The motion was heard before a full bench.

The facts were as follows:—

On the 21st day of March 1831, the legislature (P. L. 1831, p. 194) directed the canal commissioners to complete a railroad from the Schuylkill to the Susquehanna, "beginning at Vine and Broad streets, and thence to the canal basin at Columbia, eighty-

one and three-quarter miles," with the proviso, that before the canal commissioners should come west of the Schuylkill, the city of Philadelphia "shall engage to construct and continue the railroad from Vine and Broad streets down Broad street to Cedar street," and they were authorized to construct a branch railroad from any point east of Schuylkill to any points on the Schuylkill or Delaware within said city.

On the 28th of April 1831, the city councils pledged the faith of the city to the state to construct a road from Vine and Broad streets to Cedar street, according "to the true intent and meaning of the act" above quoted.

On the 6th of May 1831, a copy of this resolution of councils being before the canal commissioners, they resolved that they were thereby justified "in entering into contract for such part of the work as was made by said act dependent on such pledge."

January 10th 1833, an ordinance was passed providing, "that the Philadelphia and Columbia Railroad should be continued along the centre of Broad street, from the north side of Vine street to south side of Cedar street." Under this ordinance the road was laid, and on the 27th of February 1834 the city directed the appointment of a superintendent, who was to receive the tolls, "to be the same as those charged on the Columbia Railroad."

The Southwark Railroad Company, by their charter of April 2d 1831 (P. L. 1831, p. 360-1), were "authorized to construct a railroad, of one or more tracks, from the Delaware to Broad and Cedar streets, in such direction as they should deem best to connect with the termination of the City Railroad." April 10th 1849 (P. L. 642-3), the legislature abandoned the whole road east of a point eight miles west of the inclined plane.

The 38th section of that law required the canal commissioners to locate a railroad "to avoid the inclined plane on the Columbia Railroad, commencing at a point not more than eight miles from the head of the plane, and terminating on the west or east side of Schuylkill, as they shall deem best." The same section gave the city and districts "authority to construct a railroad from any point in the limits and cross the Schuylkill, connecting with the said railroad."

It also authorized a loan of $400,000, to build the road, to be called the "Inclined Plane Loan," and provided that "any surplus, together with the proceeds from the iron and other old materials and buildings, from the portion of the state railroad rendered useless by the adoption of the road herein provided for," should be appropriated to relaying the road west of the junction.

In 1850, the state (P. L. 1850, p. 738) authorized the sale of the bridge and all the road east of the inclined plane.

[Southwark Railroad Co. *v.* City of Philadelphia.]

By act passed April 15th 1851 (P. L. 684, § 40), $40,180 were appropriated to pay for that part of the West Philadelphia Railroad "which is now used by the commissioners in the construction of the road to avoid the inclined plane."

And by section 44, the canal commissioners were authorized to sell "all that part of the Philadelphia and Columbia Railroad from the foot of the inclined plane to the intersection of the road constructed to avoid said plane." And the whole road from the new road eight miles west was sold.

Meanwhile the Reading Railroad had become the purchasers of the old track, and her trade and the Baltimore Railroad required a connection with each other and the Pennsylvania Railroad.

Accordingly, by act passed May 3d 1860 (P. L. 780), the Junction Railroad Company was incorporated "to construct a railroad from a point on the Reading Railroad, near Peters's Island, to a point on the Pennsylvania Railroad, and thence * * * to a point upon the line of the Baltimore Railroad."

By Act of May 16th 1861, § 9 (P. L. 693), it was declared, "that when the Pennsylvania Railroad Company shall complete their connection with the Baltimore Railroad, and the councils of the city shall direct the removal of the rails now laid in Broad street, from South to Chestnut Street, the Navy Yard Company shall with the materials be required to pave," &c.

The ordinance directing the removal of the railroad upon Broad street between Olive and South, was approved May 18th 1863, whereupon the bill in this case was filed as above stated.

*St. George T. Campbell,* for complainants.—I. No intention to authorize the removal of the track can be deduced from the Act of May 16th 1861.

This would seem very clear from the language of the section. "When the councils shall direct the removal" is certainly not equivalent to saying that the councils "shall have the power to direct the removal." There are no enabling words used so far as the city of Philadelphia is concerned; nor can it be supposed that the attention of the legislature was directed to the rights or duties of the city as to the Broad street railroad when the section was passed. The object of the section was to prescribe the duties of the company just incorporated; not to confer powers upon the city of Philadelphia. That the possible removal of the City Railroad was contemplated, does not justify the inference that the removal was thereby intended to be authorized. Such a mode of statutory construction would hardly be adopted even if it were certain that the city neither had nor could have authority to remove the railroad except from the act in question. But certainly the legislature may be presumed to have thought

[Southwark Railroad Co. v.. City of Philadelphia.]
that this authority might be conferred by future legislation with the assent of all parties legally interested in the maintenance of the railroad, or that the assent of the parties alone would render any legislation unnecessary.

II. The Act of May 16th 1861 is unconstitutional, as impairing the contracts between these companies and the state, and depriving them of their franchises without compensation.

The right to connect their railroad with the City Railroad is granted by the charter of the Southwark Railroad, and the same right was purchased by the Philadelphia and Reading Railroad, as appurtenant to that portion of the state road lying between the west bank of the Schuylkill and Broad and Vine streets, which they purchased from the Commonwealth.

The Southwark Railroad Company built this road upon the faith of their charter, and the Philadelphia and Reading Railroad Company purchased from the Commonwealth upon the faith of the contract, evidenced by the deed from the Commonwealth, that the latter would not destroy or sanction the destruction of any of the rights which the former acquired by the purchase: Charles River Bridge, v. The Warren Bridge, 11 Peters 429; Thorpe v. The Rutland Railroad, 27 Verm. 140; Boston and Lowell Railroad Company v. Salem ,and Lowell Railroad Company, 2 Gray 1; Mohawk Bridge v. The U. & S. Railroad Company, 6 Paige 554; Delaware and Hudson Canal Company v. New York and Erie Railroad Company, 9 Id. 323; Ponchartrain Railroad Company v. N. O. & C. & L. P. Railroad Company, 11 Louisiana Ann. Rep. 253; State Bank of Ohio v. Knoop, 16 How. 369; R. F. & P. Railroad Company v. Louisa Railroad Company, 13 Id. 71; Boston Water-Power Company v. Boston and W. Railway, 23 Pick. 360; Central Bridge v. Lowell, 4 Gray 474; Springfield v. Con. River Railroad Company, 4 Cushing 63; Fletcher v. Peck, 6 Cranch 87; New Jersey v. Wilson, 7 Id. 164; Planters' Bank v. Sharp, 6 How. 301; Commonwealth v. Erie and North East Railroad Company, 3 Casey 369–386; 3 Phila. Rep. 316, and The Iron City Bank v. The City of Pittsburgh, 1 Wright 340, where, after reviewing many cases cited from the decision of the Supreme Court of the United States, Mr. Justice Woodward states the conclusion of that court to be "that a grant of land or of a corporate franchise by an act of legislation, is a contract between the state and the grantee, the obligation of which a subsequent legislature cannot impair:" p. 347.

III. Any Act of Assembly which would authorize the city of Philadelphia to remove the railroad on Broad street, would not only impair, but utterly annul the contract made by the city with the state, for the construction and continuance of that rail-

[Southwark Railroad Co. *v.* City of Philadelphia.]

road, to which contract the Philadelphia and Reading Railroad Company as vendee of the state has become a party.

The refusal of the state to construct the railroad between the western shore of the Schuylkill and the intersection of Broad and Vine streets, until the city of Philadelphia should "engage to construct and continue" the railroad on Broad street from Vine street to Cedar street, the pledge of the faith of the city to construct and continue the said railroad, and the acceptance of that pledge by the state, constitute a contract as solemn and as binding as can well be imagined. The rights of the state under that contract, and railroad constructed by the state upon the faith of it, have been transferred to the Philadelphia and Reading Railroad Company, and the state can neither violate the contract made with, nor permit the violation of that transferred to, the Philadelphia and Reading Railroad Company.

IV. The city of Philadelphia is equitably estopped from removing the railroad, the construction and continuance of which were secured by the pledge of the faith of the city, in reliance upon which the Southwark Railroad Company constructed their road.

But for that pledge, and the connections which it was intended to secure, the Southwark Railroad would not have been constructed.

*F. Carroll Brewster*, City Solicitor, for defendants, insisted :—
1. That the state and the city alone mutually contracted for the making of the road on Broad street ; and no other parties whatsoever, corporate or individual, were concerned in the matter.

2. That the city of Philadelphia were not even bound, absolutely, to build the road at all, but that they merely did it in consideration of the state road coming east of the river Schuylkill.

3. That the contracting parties have always regarded the road on Broad street, from Vine street south, as simply a continuation of the state road. The state regulating the rates of tolls, and the city, in point of fact, building it as a continuation.

4. That, at the time of the passage of the act authorizing the making of this road on Broad street, the Southwark Railroad Company had no legal existence, and, consequently, it could not have been referred to as a contracting party : The North Branch Company *v.* City Passenger Railway Company, 2 Wright 367.

There the charter of complainants gave them the right to connect with any road then constructed, or thereafter to be constructed. The court refused the injunction asked for, as the defendants' road did not exist, nor the right to make it, when the plaintiffs were incorporated.

5. There is nothing in the act authorizing the road on Broad

street, or in the charter of the Southwark Road, or in the ordinance of councils of 1833, which can be construed into an implication of a duty on the part of the city to maintain the track. The franchises of the Southwark Road do not extend beyond the privilege of building and running their road from the Delaware to Broad and South streets.

The corporation complainants do not even pretend that there is any contract, the obligation of which will be violated.

The most they pretend is, that "the faith of the city was pledged to construct and continue" the road.

This is not enough. They must aver and prove a contract, express and unequivocal in its terms, existing between themselves and the city, and then show how the terms of that contract have been broken.

In the case of Charles River Bridge Company v. Warren Bridge Company, 11 Pet. 420, the tolls of the bridge had long been received by Harvard College, and when the legislature authorized the construction of the Warren Bridge, those tolls were very much diminished. The old Bridge Company and the College applied to restrain the building of the new bridge, on the ground that the law authorizing it, impaired the obligation of a contract between the state and the college, securing her the tolls of the old bridge. The injunction was refused, and on an appeal to the United States Supreme Court, the decision of the state court was affirmed.

6. The state having taken up her road from a point eight miles west of the Schuylkill, and having destroyed her terminus at Vine street, she thereby discharged the city from all obligation to "continue" a road that no longer existed.

7. The state has provided another and a better route to the Delaware, has authorized the discontinuance of the road down Broad street, and has, in conjunction with the city, expended large sums of money, in rendering the new route practicable, to the great advantage of the trade and commerce, as well of the city of Philadelphia as of the whole country.

It must be conceded that the state had a right to provide a better and cheaper route into the city, and that the city could be authorized to discontinue the Broad street road.

If a private corporation had constructed this road on Broad street, could they not have abandoned it? If the enterprise had proven a failure, or had ceased to be productive (as in this very instance), the corporation would undoubtedly have been justified in discontinuing their road.

It is in the power of a private corporation, even to "dissolve itself by its own assent" (Angell and Ames 772), and to "abandon its charter:" Chief Justice Lowrie, Lauman v. The Railroad, 6 Casey 44.

Then, if the sole object of a corporation had been to build this road, it could now rightfully discontinue it.

And since the city have been authorized and directed by the state to remove this road, it must be presumed that no irrevocable franchise had ever been originally parted with, and that the necessity for the continuance of the track down Broad street no longer exists. See Charles River Bridge Company *v.* The Warren Bridge Company, 11 Peters 420.

8. It is submitted that, in reality, the Commonwealth herself is the only party possessing any reasonable ground of complaint, or just cause of objection against what has been already done, or is contemplated to be done by the city.

The opinion of the court was delivered by

AGNEW, J.—This case comes before us upon a motion for a special injunction to prevent the removal of the railroad upon Broad street, between Olive and South streets, under an ordinance of the city, approved the 18th of May 1863.

The railroad along Broad street, from Vine to Cedar, now South street, was laid down under an ordinance of the city, passed the 10th of January 1833, under the following circumstances.

The Act of 21st March 1831, providing for the construction of the railroad from Philadelphia to Columbia, contained the following clause: "And provided also, that before the canal commissioners shall contract for any part of a railroad between the western shore of the river Schuylkill and the intersection of Vine and Broad streets, the mayor, aldermen, and citizens of Philadelphia, by their proper authorities, shall engage to construct and continue the railroad from the intersection of Vine and Broad streets, down Broad street to Cedar street," &c.

This pledge was given by the city councils on the 28th of April 1831, and the canal commissioners accordingly, on the 6th of May 1831, authorized the construction of the Columbia Railroad from the Schuylkill to the intersection of Vine and Broad streets. The state entered upon the work, and the city in process of time passed the ordinance of the 10th of January 1833, already referred to in fulfilment of the pledge.

As between the Commonwealth and the city there can be no doubt these proceedings created a contract for the maintenance of the railroad along Broad, from Vine to Cedar street. But neither the Commonwealth herself, nor any one in her behalf, is here, insisting in this bill upon her right to enforce the contract.

Whatever authority may be supposed to be necessary to lay down the railroad upon the street as a public highway, there cannot be a doubt of the authority of the city, under its general powers in the acts of incorporation, to remove the rails and clear

the highways of the obstruction, when, in the judgment of the councils, it becomes necessary or convenient for the government and welfare of the city.   The 16th section of the charter of 1789 is full to this purpose.   The Consolidation Act of 1854 continues the powers of the former corporation, and confers "all the powers, right, privileges, and immunities incident to a municipal corporation" upon the present city.   The doctrine of Pennsylvania, as in England; is, that "highways being universally the property of the state, are subject to its absolute direction and control:" Philada. and Trenton Railroad Company, 6 Whart. 43, 44; Commonwealth v. Erie and N. E. Railroad Co., 3 Casey 354.   Subject to the paramount authority of the Commonwealth, the regulation and control of the streets, which are the great highways of the city, belong to the city government. This is clearly within the wide domain of power, conferred in the charters of 1789 and 1854, subject only to the exception, "provided the same shall not be repugnant to the laws and constitution of this Commonwealth."   Coupled with the power given to pass laws, &c., is the authority "at their pleasure to revoke, alter, and make anew, as occasion may require."

The right of the city to pass the Ordinance of 1863 to remove the track from Olive to Cedar street, and thereby to repeal so much of the Ordinance of 1833, cannot therefore be disputed, except by the Commonwealth, or unless the complainant is protected by a vested right.

The Commonwealth does not dissent, so far as we know, and on the contrary, by her laws and acts, seems to acquiesce.   By the Act of 10th April 1849, the canal commissioners were authorized and required to locate and put under contract a railroad to avoid the inclined plane, on the Columbia Railroad, near the Schuylkill.

To counteract the probable effect of this action the same act authorized the city and adjoining districts to create and construct a railroad to connect with the eastern termination of the state road by bridges across the Schuylkill, and to take the tolls thereupon.   This connection has been made via Market street to Broad.   In addition to this, by the Act of 10th May 1850, the Commonwealth authorized the sale of all that part of the state road lying east of the inclined plane, "rendered useless by the near road to avoid the Schuylkill inclined plane."   This portion of the road was accordingly sold by the canal commissioners to the Philadelphia and Reading Railroad Company, by deed dated 27th December 1850, for $243,000.   The latter company, have connected their road with the state road at the west side of the Schuylkill, and now use the bridge and state road to its termination at Broad and Vine streets, thus securing to the city the trade of the Philadelphia and Reading Railroad Company.

11 Wr.—21

By further legislation the Commonwealth has secured, by the Act of May 3d 1860, a connection for her assignee the Pennsylvania Railroad Company, with the Philadelphia and Reading Railroad, and the Baltimore Railroad, on the west side of the Schuylkill, thus superseding to a great extent the necessity, so far as she is concerned, of continuing the railroad from Market, down Broad to South street.

All this seems to have been done harmoniously, as we hear of no remonstrance or complaint from either the city or the Commonwealth.

Finally, in the Act of 10th May 1861, incorporating the Navy Yard, Broad Street, and Fairmount Railway Company, it was provided in the 9th section that "when the Pennsylvania Railroad Company shall complete their connection with the Philadelphia, Wilmington, and Baltimore Railroad, and the councils of the city of Philadelphia shall direct the removal of the rails now laid in Broad street from South to Chestnut street, the Navy Yard, Broad Street, and Fairmount Railway Company shall, with the appurtenances and materials thus removed, be required to place Broad street, from South to Chestnut street, in such a condition, as far as the paving, curbing, and macadamizing is concerned, as will accord with any plan which may be adopted, for the improvement of said street, by the councils of said city."

This act authorizes the Navy Yard, Broad Street, and Fairmount Railway Company to lay down a double track upon Broad street.

From all these laws and acts of the Commonwealth, it is very manifest that the Ordinance of 1863, authorizing the removal of the rails from Olive to South street, is not against but with the assent of the state. Olive street is south of Chestnut street. The ordinance is therefore valid, unless the Southwark Railroad Company, the complainants in this bill, have vested rights which it impairs.

The Southwark Railroad Company was incorporated under an Act of the 2d of April 1831, P. L. 360. The 22d section authorizes the company "to construct a railroad of one or more tracks from the river Delaware in the district of Southwark, and thence through the county of Philadelphia to Broad and Cedar streets, in such direction as they shall deem best *to connect with the termination of the City Railroad.*"

It is argued that this permission to connect with the termination of the City Railroad is a contract on the part of the Commonwealth, which is infringed by the taking up of this portion of the City Railroad, between Olive and South or Cedar streets; and reference has been made to many cases, deciding that a grant of franchise to a private corporation is a contract which cannot be impaired by subsequent legislation.

[Southwark Railroad Co. *v.* City of Philadelphia.]

Many of these cases were examined, and the doctrine summed up by Justice Woodward, in The Iron City Bank *v.* The City of Pittsburgh, 1 Wright 340, wherein he states "that a grant of land or of a corporate franchise by an act of legislation, is a contract between the state and the grantee, the obligation of which a subsequent legislature cannot impair:" p. 347.

This being the admitted principle, it becomes a question of interpretation only, and the point is, what contract did the state make with the Southwark Railroad Company when she authorized them to construct a railroad "in such direction as they shall deem best to connect with the termination of the City Railroad?"

Before solving this, it is necessary to state the rule which must guide the interpretation in this case. It is one well settled in the courts of the United States and of this state.

In the case of The Charles River Bridge *v.* The Warren Bridge, 11 Peters 544, Chief Justice Taney, following the language of an English decision, stated the rule to be, "that any ambiguity in the terms of the contract must operate against the adventurers and in favour of the public, and the plaintiffs can claim nothing that is not clearly given them by the act." In The Susquehanna Canal Company *v.* Wright, 9 W. & S. 11, Chief Justice Gibson restates the rule, as decided in The Monongahela Navigation Company *v.* Coons, 6 W. & S. 113, to be, "that the state is never presumed to have parted with one of its franchises in the absence of conclusive proof of such an intention."

Chief Justice Black afterwards stated the rule in these words: "If anything is settled, it is this rule of construction, that a corporation takes nothing by its charter, except what is plainly, expressly, and unequivocally granted:" Bank of Pennsylvania *v.* Commonweath, 7 Harris 155.

In The Commonwealth *v.* Erie and N. E. Railroad Company this rule of interpretation is still more strongly stated: 3 Casey 359.

In the present case, what was the authority conferred upon the Southwark Railroad Company? It was simply to construct their railroad "in such direction as they shall deem best to connect with the termination of the City Railroad." The authority is not expressly to connect with the City Railroad, but merely to the end that they might do so. Clearly, the utmost that can be asked for these words is a *permission* to connect. That it was nothing more than a mere license is evident, not only from the language thus used, but from the attending circumstances. The City Railroad then had no existence in fact or in contract. It was not until the 28th of April 1831, twenty-six days after the passage of the charter in question, that the city gave the pledge

[Southwark Railroad Co. *v.* City of Philadelphia.]

to make the City Railroad, in order to have the State Railroad continued from the Schuylkill to Broad and Vine streets, nor until the 10th of January 1833, that the ordinance was passed to construct it.

Besides this, the City Railroad was not a creation of the state, but of the city; while in the law authorizing the extension of the state railroad to Broad street, upon the pledge of the city, and in the resolutions of the canal commissioners founded upon it, there was no provision for the exercise of any authority by the state over the City Railroad after its completion. It is clear, therefore, that at the time of the charter of the Southwark Railroad Company the state had no power whatever to compel a connection between the two roads. There was nothing then in being to which a vested right could attach, nothing but a mere expectancy, and a legislative license to seek the connection when the city built her road, and permitted the connection. If any authority were necessary, we have a decision directly on the point in the case of The North Branch Passenger Railway Company *v.* The City Railway Company, 2 Wright 361.

As between the state and the Southwark Railroad Company, the contract could rise no higher than the franchise granted, and the state became bound only not to withdraw from the company the permission or license she had given. It involved no guaranty on the part of the state that the City Railroad should be continued for a day or an hour. It is impossible to discover in the language of the license any contract for the perpetuity of the railroad to be connected with, and therefore, according to the rule laid down, none can be implied.

So far, then, as the state is concerned, the complainants can draw no authority from her acts to bind the city to continue her railroad, and they must resort to their contract with the city (if any) in order to estop her. But here they are met by the fact that no contract regulating the connection between their road and the City Railroad was ever made, for none is set forth.

All we have in the case is, that the Southwark Railroad Company was chartered before the City Railroad was authorized to be built, and that after it was built a connection between the roads was permitted by the city, and this is only an implication from the facts stated. No time and no terms are stated to have been agreed upon, and no consideration paid. Clearly, such a license is revocable, but admitting that it might endure while the City Railroad should last, where is the contract or guaranty on the part of the city that she should keep up her road for ever, or so long at the least as the Southwark Company should require the use of the connection? Suppose the Southwark Company should choose to abandon its road at this point, and pass directly from the Delaware to the Schuylkill, is there any contract in

favour of the city which she could enforce to prevent the abandonment? We have seen no evidence of any such, yet the obligation, to be effectual, must be mutual.

Upon the whole, therefore, we perceive no ground in law upon which the complainants can compel the city to maintain a railroad in existence, which, from the passage of the ordinance to abandon, we must presume to be no longer profitable, but to be against her welfare. The facts stated and proved clearly create no ground for an equitable estoppel.

The special injunction is therefore refused.