Owl Protective Company, Inc., Appellant, *v.*
Public Service Commission.

Argued March 12, 1936.

Before Keller, P. J., Cunningham, Baldrige, Parker, James and Rhodes, JJ.

*Isaac Ash,* for appellant.

*Samuel Graff Miller,* with him *Harry H. Frank, John C. Kelley, Jr.* and *Richard J. Beamish,* for appellee.

*Benjamin O. Frick,* with him *John P. Connelly,* for Holmes Electric Protective Company, Intervenor.

*Samuel Feldman,* Assistant City Solicitor, with him *Joseph Sharfsin,* City Solicitor, for City of Philadelphia, intervenor.

OPINION BY PARKER, J., September 30, 1936:

The Owl Protective Company (hereafter referred to as Owl Company), organized under the Business Corporation Law of 1933 (15 PS 2852) complained to the Public Service Commission that the Keystone Telephone Company of Philadelphia (hereafter referred to as Keystone Company) had refused to lease wires to it for use in its burglar alarm system and asked for relief. The commission after hearing dismissed the complaint and the Owl Company has appealed to this court. The Electric Protective Society, Inc. was permitted to intervene in support of the complaint and the City of Philadelphia and the Holmes Electric Protective Company on behalf of the respondent.

The Owl Company was incorporated on June 26, 1935 and is doing business in the City of Philadelphia. Its purpose, as expressed in its charter, is "the installation and maintenance of burglar and fire alarm systems". The plan of operation of the company is to in-

stall on the doors, walls and windows of the residences and places of business of its customers a mechanism or device which is connected by wire with a gong, light or other signal device at the central office of the company so that if there is any interference by trespassers such tampering will become known and protection will be afforded. To effect the connection between the premises of each customer and the offices of the company a wire over which a light current of electricity passes is required and these wires necessarily are placed over or under the streets of the city. The Owl Company through the purchase of the business of a company formerly operating in the city had secured two circuits from the Keystone Company and was furnishing burglar alarm service and had made application for further circuits when the Keystone Company was advised that it could not lease its wires to the Owl Company since the latter company had not secured permission from the city to operate over its streets, lanes and alleys. Keystone Company then declined to lease further wires, but continued the arrangement for the use of the two wires pending the outcome of this contest. The Keystone Company is willing to furnish the service if it has a legal right so to do and if it may do so without forfeiting a franchise which it secured by ordinance from the city.

The Keystone Company was incorporated November 26, 1902 under the Act of April 29, 1874 and a supplement of May 1, 1876, P. L. 90 (15 PS 2311) authorizing the formation of corporations of the second class "for the purpose of constructing, maintaining and leasing lines of telegraph for the private use of individuals, firms, corporations, ...... for general business and for police, fire alarm or messenger business, or for the transaction of any business in which electricity over or through wires may be applied to any useful purpose". The purpose expressed in the charter

of the Keystone Company is in the same words as those used in the act to which was added the clause, "including the maintenance and operating of a general telephone system and telegraph business".

It was provided by an amendment to the Act of 1876 passed June 25, 1885, P. L. 164 (15 PS 2314) : "Before the exercise of any of the powers given under this act, application shall be first made to the municipal authorities of the city, town or borough in which it is proposed to exercise said powers, for permission to erect poles or run wires on the same, or over or under any of the streets, lanes or alleys of said city, town or borough, which permission shall be given by ordinance only, and may impose such conditions and regulations as the municipal authorities may deem necessary." By ordinance of the City of Philadelphia, passed August 5, 1886, it was provided: "Should any company, corporation, firm or individual to which privileges have heretofore been or shall hereafter be granted for the laying of underground wires, electrical conductors, conduits, ...... dispose of any of the franchises granted by the ordinance, or lease to, consolidate, or merge with any other company, corporation, firm or individual, they shall forfeit all rights and privileges granted to them by the City of Philadelphia."

The City of Philadelphia on December 26, 1902 (Ordinances of 1902, p. 323) granted permission to the Keystone Company to "open streets, construct conduits and manholes and erect a terminal pole in each block, and to lay, erect, maintain and operate a conduit system of cables, wires, electric conductors and terminal poles for telephone and telegraph purposes, in, over, across, under ...... the streets of the City of Philadelphia." By this ordinance the Keystone Company was also authorized to "lease any portion or all of its conduits, poles or wires not used by it for the transaction of its business to any other corporation having

authority to use the same." The Owl Company has not secured from the city any right to make special use of the streets of the municipality. The intervening appellee, Holmes Electric Protective Company of Philadelphia, has secured such a consent from the city and is paying a considerable return to the city for the use of the streets and the respondent Keystone Company is leasing wires to it. Keystone Company has also leased wires to Philadelphia Local Telegraph Company for use in the operation of a fire alarm system.

The appellees contend that by the terms of the ordinance granting to Keystone Company the right to use the streets of the city, the Keystone Company is not permitted to lease wires to the Owl Company until permission is granted it to so use the streets by the City of Philadelphia and that the service demanded of the Keystone Company by Owl Company is not a public service.

The commission relied on the first contention for support of its order dismissing the complaint. The arguments on that phase of the case all ultimately turn upon the meaning and effect to be given to that clause of the ordinance of 1902 which provides that conduits, poles and wires may be leased to any other corporation *"having authority to use the same"*. We are required to determine the meaning and effect of the last phrase.

We agree with the commission and the appellees that the commission had not only the power but that it was its duty to determine whether the Keystone Company had a right under the ordinance of 1902 to lease wires to the Owl Company in advance of the securing by the Owl Company of permission to use the streets. In *Pittsburgh Rys. Co. v. P. S. C.*, 115 Pa. Superior Ct. 58, 62, 174 A. 670, we said: "It is well settled that the commission has jurisdiction to determine whether corporations have the right to do or not do the thing for which the commission's approval is sought." In *Fogels-*

*ville & T. Elec. Co. v. Pa. P. & L. Co.*, 271 Pa. 237, 243, 114 A. 822, the Supreme Court said: "For a proper determination of the many matters submitted, the commission has certain inquisitorial powers which may, to a degree, conflict with those generally understood to be within the purview of quo warranto by the attorney general. In passing on applications or complaints, as the case may be, as to duties, liabilities, powers and limitation of powers of a public service company, inquiry must be made as to the rights or powers of the company to do or not to do the thing applied for or complained about."

The precise reason assigned by the Keystone Company for its refusal to supply the wires asked for by Owl Company is that the granting of the request would involve giving to the latter company the use of the streets of Philadelphia for carrying on of an independent business without the consent of the city. It is well settled that no person, corporation or individual, has the right to make a special or exceptional use of a public highway not common to all citizens except by grant from the sovereign power: *Phila. Co. v. Freeport Boro.*, 167 Pa. 279, 31 A. 571. The legislature, exercising its sovereign power, has delegated to the city the regulation and control of its streets. "Subject to the paramount authority of the Commonwealth, the regulation and control of the streets, which are the great highways of the city, belong to the city government": *Phila. Elec. Co. v. Phila.*, 301 Pa. 291, 303, 152 A. 23. Also see *The Southwark R. R. Co. v. Phila.*, 47 Pa. 314; *Ellwood Lumber Co. v. Pittsburgh*, 269 Pa. 94, 112 A. 19. As affecting the right of respondent to make a lease of wires, the legislature, by the Act of June 25, 1885, delegated to the municipality the right to exercise a special control over the use of the streets, lanes and alleys of the municipality by telephone and telegraph companies for it was provided that notwith-

standing the charter granted by the commonwealth, such companies should not exercise any of the powers given it to run wires over or under any of the streets, lanes or alleys of the city, town or borough, until granted authority by ordinance which might impose such conditions and regulations as the municipal authorities deemed necessary. It follows that the municipality as the delegated agent of the commonwealth had the right to impose the conditions which it did when it granted the use of the city streets to the Keystone Company, and that if those conditions cover the present situation they are enforceable: *Keystone T. & T. Co. v. Ridley Park Boro.*, 28 Pa. Superior Ct. 635.

The Owl Company does not seriously question this principle, but says, in effect, that it is a business corporation engaged in a private business not affected with a public interest and that it does not propose to use the streets of the city, but only asks permission to become a patron of the Keystone Company which has permission to use such streets. In short, it asserts that it is in no different position than that of other patrons of telephone companies, for example, a brokerage firm which leases a wire for its exclusive use. On the other hand the appellees, sustained by the commission, contend that the Owl Company is making an independent use of the streets and proposes so to do in the future if granted the use of the wires in question and that it may not so use the streets without first securing the consent of the city.

It therefore becomes necessary to consider the nature of the business that would be done by the respondent and the use which would be made of the wires by the complainant. It is clear that the Owl Company wished exclusive use of a wire that is not employed in the ordinary telephone service rendered by the Keystone Company. Appellees insist that the wires intended to be used are what are known as "dead" wires, that the

current to operate the signalling device is to be furnished by the Owl Company and that the Keystone Company will have nothing to do with operations over the line, but will be concerned alone in maintaining the integrity of the line. While appellant asserts in its argument that the current may be supplied by the Keystone Company, we think the record shows that it is proposed to use what is known as a dead line. The complaint was that the respondent had refused to lease wires to complainant which would be "connected direct from the applicant's place of business to the customers of the applicant where the burglar alarms are installed." If it was some other and different service that complainant wished to enjoy it should have so alleged and shown by its proofs. However, as we shall see, the fact as to whether the current might be supplied by one or other of the parties is not essential to a determination of the actual use contemplated.

Considering the nature of the proposed service from the standpoint of both lessor and lessee it seems clear to all of us that if the demand of the appellant is granted and the Owl Company carries out its plan to serve customers in the business district of Philadelphia, such actions would constitute a use of the streets by the Owl Company and a consequent violation of the condition of the ordinance of 1902. The evidence contained in the record with reference to the actual operations by the Keystone Company, and a consideration of the terms of its charter rights and franchise from the city, show that while the primary business of the Keystone Company is what is known as a telephone or telegraph business it is in a position to do and has been transacting a business disconnected therewith. The operation of a telephone system in a large city necessitated the construction of conduits which could not be economically constructed so as to furnish a pre-determined and exact capacity intended only to accommo-

date the telephone business as it then existed. The ordinance granting a franchise to the telephone company shows that both the company and the city foresaw that when the company constructed its conduits it would have a surplus capacity at least for a time and that there would be other companies or individuals who might need and could make profitable use of idle wires. From the viewpoint of the city it was desirable to consider this matter for it would avoid unnecessary tearing up of the streets if the company was permitted to lease idle wires or wires not required for its ordinary business. It is therefore most apparent that we are here dealing with a situation where the Keystone Company was authorized to act and is acting in two capacities. It is primarily a telephone company in the ordinary acceptation of that term, furnishing a service to the public and it also had space in its conduits and wires which were not required in the transaction of its business and which it was authorized to lease. The city by the ordinance of 1902 recognized these two kinds of business for it granted to Keystone Company the right to install a conduit with wires and other fixtures for use in its own business and in addition authorized it to lease excess space or wires to others and treated the two situations differently. When it furnished service itself as part of its business there were no limitations, with which we are now concerned, but when it leased its excess facilities to others its power to lease was subject to the limitation that the assignee had the right to enjoy the grant.

By the general ordinance of 1886 it had been provided that companies such as the respondent should not be permitted to transfer their franchises but when the franchise was granted to the Keystone Company special provision was made so that it might lease wires to others. This would indicate an intention upon the part of the city to make it impossible for the Keystone

Company to transfer rights it obtained from the city to others if such transfer would deprive the city of the control of its streets. A lease of conduit or wires to a corporation which had obtained the right to use the streets would not interfere with the city's control.

Considering the business from the standpoint of the Owl Company, it is an independent business—furnishing protection from burglars—in which it is engaged, employing its own devices, mechanisms and equipment. The wires from office to customer are and would be a substantial part of its physical plant. It is demanding from the Keystone Company not an ordinary telephone or telegraph service, but wires which it would employ in performing a class of service not rendered by this telephone company. The Owl Company would furnish burglar protection and the Keystone Company telephone service.

The Keystone Company accepted the ordinance granting it the right to use the city streets subject to a condition which the city was empowered to impose and consequently it may not do that which is prohibited by the ordinance. Certainly the phrase in the ordinance, "having authority to use the same", means that the assignee must have the right to occupy the streets for that is the very matter with which the provision deals. The Owl Company like all other persons has a right to demand of the Keystone Company the telephone service which Keystone Company as a public service company is furnishing to the public but when it demands the use of idle wires, mere physical property, even though it may be a public service, it is asking the Keystone Company to do something as to which it has only a limited power. If the Keystone Company may lease wires to Owl Company it may lease them to telegraph or other telephone companies or to any other company which makes use of electric currents passing over wires.

The complainant suggests that the service which it

demands is not different from that of furnishing private wires to brokerage firms and others. We do not find that the situations are comparable and on the contrary believe that they are not only essentially different, but tend to emphasize the correctness of the conclusion at which we have arrived. The telephone company in furnishing the use of private telephone wires to brokerage firms does not, as we understand it, turn over the wire to its customer, but simply furnishes exclusive use of the wire for telephone service during certain hours. This is only a special phase of ordinary telephone service. Here it is a wire and not service that is being furnished. The situations would be more nearly parallel if the telephone company leased a naked wire to a corporation which with its own devices and instruments then proceeded to make use of such wire. Neither do we think it important that the Keystone Company may furnish the current for the wires. The Owl Company still furnishes all other equipment and devices necessary to constitute a burglar alarm system.

To summarize our conclusions, we are of the opinion that the city had the power to impose the conditions which it did in the ordinance of 1902, that the ordinance dealt with two distinct situations, direct use of the conduits and wires by the Keystone Company in supplying service itself to the public and the leasing of conduits and wires to other *corporations* for an independent use, and that the use which the Owl Company proposes to make of the wires it wishes to lease, places such use in the latter class. To hold otherwise would render the conditions in the ordinance of 1902 of no effect and permit the Keystone Company to grant the use of the streets to all other corporations, operating by means of electric current over wires, without the consent of the city.

In view of the conclusion at which we have arrived we deem it unnecessary to dispose of the contention of

the appellee and the commission in its brief that the complainant failed to show that Keystone Company is, with respect to leasing wires not required in its telephone business, engaged in a public service. We also feel that it would be unfair to the appellants to rule the case on that ground for the reason that the complainant attempted to develop facts which bore directly on the extent and nature of the service rendered with respect to the leasing of the wires and it was not permitted so to do by the commissioner who conducted the hearing. Counsel for complainants was not permitted to interrogate the executive vice president of the respondent as to the nature of the service which was rendered with respect to leasing wires and the persons whom the respondent was serving or offering to serve, but was limited to an inquiry as to the wires leased and the persons with whom contracts were made for burglar alarm purposes only. The actual business conducted and the persons with whom the Keystone Company dealt, with respect to leasing conduits or wires bore directly on the question as to whether the respondent was doing a public or a private business. This was true regardless of whether the wires were leased for a burglar alarm system, or a fire alarm system, or any other business making use of electric currents passing over wires. We therefore rest our decision on the grounds first stated.

The order of the commission is affirmed.