## Wilson et al. v. McGill

*Michael A. Maloney*, for plaintiffs.
*Arthur W. A. Cowan*, for defendant.

OLIVER, P. J., November 29, 1940.—In her bill, Sallie E. Wilson alleges she is the owner of premises at the north-west corner of Fifty-sixth and Market Streets, Philadel-

phia, known as 5601 Market Street, occupied as a retail drug store and apartment house; that she is also owner of the land under the sidewalks and vehicular ways on that corner, subject to the easement of the public; that she has a statutory right to reclaim the sidewalks and vehicular ways whenever they may be vacated for use as such; that defendant since November 1, 1938, without her consent and against her objection has been conducting on the sidewalks of her property the business of selling newspapers, magazines, and other publications and has been maintaining on the sidewalk wooden stands and other equipment for displaying newspapers, magazines, and publications; that defendant has declared it to be his purpose to acquire an easement in plaintiff's property for the conduct of his business without payment of any compensation to plaintiff; that plaintiff has the responsibility of keeping the sidewalks in proper repair and defendant's business is causing abnormal wear which plaintiff will have to repair; and that defendant is obstructing the sidewalk, preventing free access to the drug store, obscuring the view of plaintiff's property and the drug store thereon, and causing persons to loiter and congregate on the corner to the annoyance of plaintiff. Plaintiff prays for an injunction and an order directing defendant to remove his stands and equipment from plaintiff's sidewalks.

In his answer, defendant avers that the City of Philadelphia is owner in fee of the land under the sidewalks and vehicular ways at the corner of Fifty-sixth and Market Streets, having acquired such land by deed dated July 17, 1897; that the rights of the public include, in addition to the mere right of passage, such matters of public interest, use or convenience as may be necessary, proper, or incidental to public use of the sidewalks; that plaintiff acquiesced in defendant's use of the sidewalk for several months after November 1, 1938, and demanded and received sums totaling $10 as rent; that for some years prior thereto plaintiff purported to lease to defend-

ant's predecessor in the business of vending newspapers and magazines the right to maintain news and magazine stands on the sidewalk of her property and collected therefor $15 monthly; that plaintiff has leased the drug store and the apartments and does not occupy any part of the premises; that none of the tenants objects to defendant's conducting his business on the sidewalk; that plaintiff does not come into court with clean hands and is motivated by a desire to exact money from defendant and not to vindicate any public right; that defendant has no intention or power to create any easement against plaintiff's property; that his stands are under the stairway leading to the Market Street elevated railway and cause no interference to persons entering or leaving the drug store on plaintiff's property; that plaintiff resides in Woodbine, York County, Pa., and her property is in a busy commercial and business community; that plaintiff is not suffering any damage special and peculiar to herself and that, if a public wrong is being suffered, she has no standing to remedy such wrong.

In the bill filed by Robert J. Wilson, a son of Sallie E. Wilson, it is alleged that Robert is a citizen of Philadelphia; that he manages the property at Fifty-sixth and Market Streets for his mother; that without the consent, and against the wishes, of himself and his mother defendant is selling papers and magazines and maintaining stands on the sidewalk of that property and has declared his intention to acquire such an easement as will enable him and his successors to conduct such business against plaintiff's wishes; that the conducting of the business is prejudicial to the interests of the community, encourages loitering, impedes pedestrians, wears out the sidewalks, and annoys plaintiff as manager of the property; and that plaintiff by letter dated October 31, 1939, notified the City of Philadelphia that he wanted the encroachments abated but the city has failed to act. Robert prays for the same relief sought by his mother.

In his answer, defendant repeats substantially the averments in his answer to the bill filed by Sallie E. Wilson and avers also that, for several months after November 1, 1938, Robert acquiesced in the use of the sidewalk by defendant and demanded and received from defendant sums totaling $20 as rental for such use; that Robert had title to the property for a number of years and, as owner, for years collected from defendant's predecessors in the business $25 per month as rental for the privilege of using the sidewalk to sell newspapers and magazines to the public and to maintain thereon stands for such purpose; that Robert, therefore, does not come into court with clean hands when he now asserts that the presence of the stands on the sidewalk is a public nuisance and that his motive is to exact from defendant payment of money for proper use of a public sidewalk and not to vindicate any public right; that defendant has no intention and no power to create any easement in any public sidewalk or in or affecting any property of plaintiff or his principal; that the sale of newspapers and periodicals upon a public sidewalk is a proper public use thereof and that the regulation of matters affecting the footways and highways of the city has been delegated to the Department of Public Works under the Philadelphia City Charter Act of June 25, 1919, P. L. 581, as amended, and such department has at all material times permitted activity, similar to that carried on by defendant, upon footways and upon this particular footway; that the activity carried on by defendant serves a recognized public need and convenience in a busy commercial community; that the Act of May 3, 1927, P. L. 515, upon which Robert's bill is predicated, is unconstitutional in that it violates section 7 of article III of our State Constitution; and that the granting of the relief sought would be contrary to the provisions of both our State and Federal Constitutions in that it would constitute an interference with the constitutionally protected rights of freedom of speech and of the press. . . .

Plaintiff Robert is seeking equitable relief under the Act of May 3, 1927, P. L. 515, 17 PS §305, which reads as follows:

"The courts of common pleas of the several counties of this Commonwealth, in addition to the powers and jurisdictions heretofore possessed and exercised, shall have the jurisdiction and powers of a court of chancery, so far as relates to the prevention, restraint, and abatement of encroachments on public sidewalks in front of residences, churches, hotels, apartment houses, or retail stores contrary to law and prejudicial to the interests of the community, upon the complaint of any municipality, or any citizen thereof, alleging injury thereby, without regard to whether or not such citizen has suffered damage or injury which is special to himself, where the said municipality has failed or refused to institute action for the prevention or restraint of such encroachments in front of residences, churches, hotels, apartment houses, or retail stores contrary to law, within thirty days after written notice thereof to such municipality by or on behalf of such citizen."

Plaintiff Robert proved that he was a citizen of Philadelphia, that the newsstands are being maintained by defendant, and that the city had failed to act upon his written notice. However, his suit must fail because he comes into equity with unclean hands and because he has not shown that the maintenance by defendant of the newsstands under present conditions constitutes an encroachment prejudicial to the interests of the community, that is, a public nuisance.

As to the first ground for our decision, the doctrine of unclean hands "assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject matter or transaction in question. It says that whenever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain

some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy": 1 Pomeroy, Equity Jurisprudence (4th ed.), sec. 397. This quotation has often been approved by our courts. See, for a recent example, Hoffman's Appeal, 319 Pa. 1, 7 (1935).

In the present case, plaintiff Robert is seeking to abate an alleged public nuisance which for many years he fostered. From it he gained a financial benefit up to the brief period prior to the beginning of this suit. He never considered obtaining the abatement of the alleged nuisance until it no longer rendered him a profit. He permitted stands upon the sidewalk which occupied much more space, and must have been decidedly more open to objection than those now used by defendant. After defendant purchased the goodwill of his predecessor and thereby invested $2,300 in the business, he was notified that he must pay rent to plaintiffs in order to use the sidewalk. When defendant stopped his rent payments after the first month, he was notified to move the stands. Plaintiff's theory is that defendant is maintaining a public nuisance in that he is using the sidewalk for a private business. Yet plaintiff himself has for many years been guilty of exactly the same offense, promoting what he now claims is a public nuisance and doing so for private gain.

There is little doubt that plaintiff's motive in bringing this suit was to secure indirectly through the strong arm of equity the payment of rent. The chancellor cannot countenance such use of equitable procedure.

Robert's attitude was openly revealed by his treatment of the other newsboy, Polarsky, who maintained one newsstand on the sidewalk for the sale of morning papers. So long as Polarsky agreed to testify for plaintiffs, he was not disturbed. But when he refused to appear as plaintiff's witness, he was notified that he would have to move his business.

A somewhat analogous situation was presented in Philadelphia Tapestry Mills, Inc., et al. v. Philadelphia Storage Battery Co., Inc., et al., 11 D. & C. 153 (1928). That was a suit to enjoin defendant from erecting a building in the bed of a public street. Judge (now Mr. Justice) Stern held, inter alia, that plaintiff did not come into equity with clean hands because he himself was maintaining an extremely large coal pile and a garage property in the bed of the street. The court said (p. 163):

". . . the acts done by this plaintiff are *in pari delicto* with those done by the defendant and which are now sought to be enjoined; it would be an absurdity to hold that a plaintiff should be granted relief in equity against the performance of an act exactly similar to that performed and still persisted in by himself."

In the present suit, a fortiori, plaintiff Robert for many years has actually promoted the very act which he now seeks to enjoin because it no longer affords him a financial profit.

The fact that during the period of defendant's occupancy of the sidewalk plaintiff Robert was only an agent is immaterial. His principal, the owner, was a nonresident and never appeared on the property. Plaintiff Robert had complete control and management of the property and participated in the wrong as much as anyone for whom he acted. His motives were those of his principal and he is thereby infected with unclean hands in the same manner as she would be if she sued to abate the alleged public nuisance as such.

Furthermore, we cannot agree that the maintenance of a newsstand upon a busy corner constitutes per se a public nuisance so long as there is no actual interference with travel on the sidewalk or with any other bona fide public use thereof.

"It is a settled principle that the legislature has the power of control over encroachments into or over public highways, from house line to house line, and this control

may be delegated to municipalities in the State: Reimer's App., 100 Pa. 182, 185; Lenon v. Porter, 65 Pa. Superior Ct. 94, 98. As we stated in Reimer's App., supra, the councils of Philadelphia derive power to make rules and regulations in this regard from the Act of April 16, 1838, section 3, P. L. 626. The City Charter Act also grants such power": Walnut & Quince St. Corp. v. Mills et al., 303 Pa. 25, 31 (1931).

The City of Philadelphia first regulated the sidewalks by the ordinances of September 23, 1864, no. 343, and December 24, 1864, no. 480, which listed numerous uses of the sidewalk as nuisances. But newsstands were not included expressly or by construction. On June 30, 1931 (p. 251), and September 5, 1939 (p. 555), the city council adopted further ordinances restricting the use of the sidewalk in certain sections of the city. But, in each case, the ordinance did not cover the location of the present sidewalk, and, in any event, in each ordinance it was provided that nothing in the ordinance should affect the right to sell newspapers. It is clear, therefore, that the city has not exercised its right to control the use of the sidewalks *by newsboys.* Since the Act of 1927, supra, in effect extends the remedy, in a restricted number of cases, for what amounts to a public nuisance, our decision must rest on the common-law conception of that offense.

According to the earlier cases, any permanent encroachment upon the highway constituted a public nuisance whether it impeded travel or not: Commonwealth v. McNaugher et al., 131 Pa. 55 (1890) ; 1 Wood, Nuisances (3rd ed.), sec. 250. Some jurisdictions have recently applied this rule to modern situations and in at least two instances to newsstands: People ex rel. v. Buck, 193 App. Div. 262 (1920), affirmed in 230 N. Y. 608; see also People ex rel. v. Keating, 168 N. Y. 390 (1901). In State ex rel. v. Londrigan, 4 N. J. Misc. 574 (1926), a newsstand was declared to be a public nuisance because it narrowed the sidewalk and obscured a clear view of the window of the adjacent building.

We prefer to adopt the more salutary rule, in view of modern conditions, that newsstands maintained on commercial corners without in fact impeding public travel do not constitute a public nuisance and may not be enjoined as such. No citation of authorities is necessary to support the proposition that the common law is not static but dependent upon changing social conditions. This principle has been recognized particularly with reference to the question of what are proper uses of the highway: Joyce, Nuisances (1906), sec. 212. In speaking about modern uses of the highway, the above author states:

"Though some of these uses could not have been in contemplation when the highways were originally established, yet with the advance and progress made as time passes certain uses have been recognized as legitimate uses not inconsistent with the use of the highway. So it has been determined and is a generally accepted principle that when a highway is dedicated without restriction to the public use it is always dedicated with regard to the necessities of future times. The following words by Judge Cooley [Macomber v. Nichols, 34 Mich. 212, 216] are pertinent in this connection: 'The restrictions upon its use are only such as are calculated to secure to the general public the largest practical benefit from the enjoyment of the easement, and the inconveniences must be submitted to when they are only such as are incident to a reasonable use under impartial regulations. When the highway is not restricted in its dedication to some particular mode of use, it is open to all suitable methods; and it cannot be assumed that these will be the same from age to age, or that new methods of making the way useful must be excluded merely because their introduction may tend to the inconvenience or even the injury of those who continue to use the road after the same manner as formerly.' "

A timely example of the application of this principle to another type of nuisance is the recent attitude of our courts toward public garages in semi-residential sections

of the city. See Burke et al. v. Hollinger, 296 Pa. 510 (1929), wherein it was said (p. 520):

"Courts cannot stop progress; it must and will break through any judicially established principle, as it must and will break through any law that impedes its natural growth. Business progress is ever callous, never grateful, and, as it goes forward, heeds neither the weak nor the strong who may stand in the way. . . . but from these sacrifices the community as a whole prospers and is benefited. . . . On the other hand, while progress cannot be checked, it may be so regulated as to do a minimum amount of harm in comparison with the good that it brings. To attempt to shackle business or progress, even if we could, would dwarf the life of a community, even as it would have dwarfed the life of the states years ago, had the rights of individuals been considered of higher value than those of the community generally. The truth of this is axiomatic in national upbuilding."

It is readily apparent that under modern conditions newspapers are more than a public convenience; they are a necessity. The fact that newspapers are not public utilities, and therefore not subject to regulation with respect to their advertising rates (Sharon Herald Co. v. Mercer County, 132 Pa. Superior Ct. 245, 251 (1938)), is immaterial here. Democracy, so much dependent upon a well and quickly informed public opinion, cannot be expected to survive without the organized publication and the speedy and unhampered distribution of news, protected by the constitutional doctrine of freedom of the press.

"Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value": Lovell v. City of Griffin, 303 U. S. 444 (1938), quoting from Ex parte Jackson, 96 U. S. 727.

The circulation of newspapers in our great cities through newsstands on commercial corners has become a well-established custom, meeting an urgent public need. It is a fact of common knowledge and a proper subject of

judicial notice. As newspapers have become more and more vital to the democratic process, the reading public has grown enormously. With the rapid growth in the speed of communication throughout the world, the number of daily editions has steadily increased. In this constantly-growing development in the dissemination of news, the newsboy and his corner newsstand have achieved a definite and essential place.

Even in the case of permanent encroachments upon the highway, it has in some situations been recognized that the chancellor in his discretion may refuse equitable relief where there is no real obstruction to travel. This principle was aptly stated by Justice Sharswood in City of Philadelphia's Appeal, 78 Pa. 33, 39 (1875), wherein he said:

"We concede that no usage, however long-continued, will justify an encroachment great or small upon a public highway. But in the exercise of that sound discretion with which a chancellor is invested, he may well consider and give effect to such an usage as rightfully persuasive to arrest his interposition by the writ of injunction. Otherwise he might be made the instrument of very gross injustice. Courts of equity are not instituted in general to enforce abstract legal rights. There must be substantial, irreparable injury attempted. The encroachment on a public highway to be remedied by this process must be really an obstruction to the free use of it. Now it is very clear that, admitting that the defendants were bound to fall back with their new front, to the new line—the columns, cornices and ornaments they have added to their new front are no real obstruction of the highway, though it may be that technically they are so. . . . Every case of this kind must depend on its peculiar circumstances and will form no precedent for any other case varying from it in those circumstances or the character and extent of the encroachment."

See also Commonwealth ex rel. v. First National Bank of West Newton, 207 Pa. 255 (1903).

". . . Courts of Equity will grant an injunction to restrain a public nuisance only in cases where the fact is clearly made out upon determinate and satisfactory evidence. For if the evidence be conflicting, and *the injury to the public doubtful,* that alone will constitute a ground for withholding this extraordinary interposition": 2 Story, Equity Jurisprudence (14th ed.), sec. 1252. (Italics supplied.)

In view of the above discussion, the chancellor concludes that a newsstand upon a commercial corner is a public convenience and a proper public use of the sidewalk and not a public nuisance per se, and therefore cannot be enjoined so long as it does not in fact obstruct free passage along the sidewalk, and is not excessive in size or otherwise objectionable.

In the present case, we need not concern ourselves with the condition of the sidewalk prior to April 1940, although the credible evidence on that score leaned heavily in defendant's favor. In equity the relief to be granted is governed by conditions existing at the time of the decree: Randel v. Brown, 2 How. (U. S.) 406 (1844); 8 Stand. Pa. Prac., p. 266. Sometime prior to the hearings, defendant reduced the number and size of his stands and changed their location, as the oral testimony and the photographs clearly show. Defendant is at present maintaining only two small, movable stands, and both have been removed from premises 5601 to premises 5603 Market Street, except for the extension of a small leaf of one table a short distance over the property line. Furthermore, there was more than ample testimony that the stands, particularly as presently located, never in fact obstructed travel on the sidewalk, and that Fifty-sixth and Market Streets is a busy, commercial intersection. Consequently, the existing situation does not call for relief in equity. Defendant has always acted in good faith, and we are convinced that he will not bring back the old stands. If he should in the future conduct his business in

such manner as to impede traffic on the sidewalk, plaintiff may then again seek appropriate relief.

Plaintiff Sallie presents a different theory. She is suing as the owner of the property and contends that defendant is a continuous trespasser using the sidewalk in an unlawful manner. Also, she claims that he is developing an easement in her property. No question of unclean hands arises with regard to plaintiff Sallie. She does not pose as a vindicator of public rights, but seeks redress for alleged damage to her property and for alleged infringement of her rights as owner.

"Contrary to a general impression, when land has been taken for public use as a highway, the owner does not surrender his entire title to the land so taken, but reserves the fee in the residue of the highway land and he may, as to such residue, exercise full rights of ownership. This residue of fee embraces rights above and below the surface: *Cain v. Aspinwall-Delafield Co.*, 289 Pa. 535, 539. Above, or on, the surface he may prevent members of the public from an unlawful use of the highway": Breinig et ux. v. Allegheny County et al., 332 Pa. 474, 477 (1938).

Also, "The tenant on the first floor has no peculiar interest in the sidewalk. If it can be said that the sidewalk was intended for the benefit of the tenant on the first floor, it was equally intended for the benefit of the tenants of the upper floors, who also have a right to approach and leave the building. . . . Where the entire premises are leased to one tenant, that tenant has undivided possession not only of the actual building, but also of such portion of the sidewalk as goes with it. . . . On the other hand, where different rooms in the same building are leased to various tenants, and no one tenant has exclusive possession of any portion of the premises beyond the actual rooms which he occupies, there can be no responsibility on the part of one for the benefit of all.

"The owner has thus neither placed full possession nor full responsibility in any one party. . . . Indeed, it is not strictly correct to say that the owner is out of posses-

sion": Baxter et al. v. Borough of Homestead et al., 120 Pa. Superior Ct. 182, 186 (1935).

Thus, plaintiff Sallie, as the owner of a property leased to more than one tenant, may seek to enjoin defendant as a continuous trespasser if that is what he is. However, in order to enjoin defendant as a trespasser plaintiff must show that the use of the highway is unlawful: Breinig et ux. v. Allegheny County et al., supra. We have already found that defendant has been using the sidewalk lawfully in pursuance of the public easement and that his use constitutes a public convenience. Being within the scope of the dedication to the public, it is a permissive use and cannot amount to a trespass. For the same reason, defendant cannot acquire an easement, inasmuch as his use is not adverse.

Defendant cannot be said to have abused the privilege, accorded to public users of the sidewalk, by having caused an undue amount of damage to plaintiff's property. Whatever harm has resulted to plaintiff's property from corner loungers cannot be ascribed in any way to the presence of the newsstands. Boys are lured to commercial corners by the modern drug store, as a center around which they lounge or indulge in mischievous antics. The newsstands were not shown to be the sine qua non attraction. Furthermore, the police have for the most part broken up the group of loiterers who formerly congregated on the corner. Also, as stated above, defendant has moved all his stands from the 5601 sidewalk, except for a small leaf of one table extending over the property line. In addition, it was proved that plaintiff has suffered no reduction of rent as a result of the presence of the newsstands and that no tenant has ever complained. Consequently, plaintiff Sallie is also not entitled to relief.

### Opinion sur exceptions

PER CURIAM, April 7, 1941.—A careful study of the exceptions to the findings of fact convinces us that they are in the main trifling and based upon plaintiffs' testi-

mony—which was contradicted by the testimony of more credible witnesses—rather than upon the testimony as a whole. However, the tenth finding of fact is amended by adding at the end thereof the words "and periodicals". The twenty-sixth finding of fact is amended to state that the rent paid varied "from $15 to $25 per month" instead of varying "from $10 to $25 per month".

The questions of law raised by the exceptions were all disposed of adequately and properly in the adjudication.

At the oral argument, counsel for plaintiffs admitted that his clients would have no cause for complaint if defendant merely walked or stood upon their sidewalk to sell his papers and that their grievances center upon the fact that the doors of the small stand defendant maintains, under the elevated stairway and upon the sidewalk of the adjoining property, are occasionally opened and, when opened, extend a short distance over plaintiffs' sidewalk, and also upon the fact that a side leaf of another small stand, maintained along the side of the elevated stairway, projects, when erected, 20 inches across plaintiffs' sidewalk. The meagerness of these complaints confirms in our view the opinion of the chancellor that plaintiffs' actions were not taken in good faith but to compel the defendant to pay them rent for the privilege of maintaining what the plaintiffs now seek to condemn as an alleged public nuisance.

Reviewing the entire matter with care, we are of the opinion that, except for the two trifling changes above made, all questions of law and fact were correctly disposed of in the adjudication. Plaintiffs' exceptions to findings of fact numbered 10 and 26 are sustained and those findings are amended as above noted. All other exceptions are dismissed. A final decree will be entered in accordance with this opinion.