46 South 52nd Street Corporation, Appellant, *v.*
Manlin, Appellant.

Argued April 30, 1959.   Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

*Sheldon Tabb,* with him *Edward Davis,* for defendant.

*Jerome J. Cooper,* with him *Wolkin, Sarner & Cooper,* for plaintiffs.

*Harold E. Kohn* and *Arthur Littleton,* with them *Dolores Korman* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* for interested parties, under Rule 46.

OPINION BY MR. JUSTICE COHEN, January 18, 1960:

Plaintiffs instituted this action in equity to enjoin defendants from operating a newsstand for the sale of newspapers, magazines, pocket books and comic books on the sidewalk of a public street in Philadelphia.

The defendant, Oscar Manlin, started selling newspapers in Philadelphia in 1932. At that time he was going to high school, and after school, with the permission of the then owner of 46 South 52nd Street (which is on the Northwest corner of 52nd and Chestnut Streets), he would sell his newspapers from a small wagon located on the sidewalk. After he had been working there for three months, he asked the Philadelphia Evening Bulletin for a newsstand which was set up on the corner. Originally, it was about four feet long, five and a half feet high and about twenty-four inches wide. Since then he has gradually added various racks, additional stands and benches so that at the time of the commencement of the present action in equity in November, 1956, the newsstand was comprised of two newspaper stands, several benches and racks and a magazine stand, all of which were approximately 9 feet 4¼ inches long and 6 feet 3 inches high. There are sold on defendant's newsstand six or seven newspapers, approximately 300 different magazines and many kinds of comic books and pocket books and several racing forms. Approximately 40% of the physical space of the newsstand is devoted to the sale of newspapers and 60% to magazines, comic books and pocket books. A little more than 50% of the gross in-

come of the newsstand is derived from the sale of newspapers, the balance from the sale of the other printed matter.

In 1944, plaintiff corporation acquired title to 46 South 52nd Street at a cost of $100,000. Prior to that time, the individual plaintiffs, trading as the partnership of Brait's Men's Furnishings, the partners of which concern are also proportionate owners of plaintiff corporation, were tenants of 46 South 52nd Street as well as the adjoining premises, 44 South 52nd Street, and occupied both as a men's wear retail store.

In 1953, plaintiffs purchased and leased additional properties and undertook extensive and costly remodeling at their 52nd Street store, breaking down all the adjacent walls between what was formerly three premises and creating a new single store front on 52nd Street. The volume of business carried on by Brait's is approximately $250,000 per year.

In 1954, defendant Manlin voluntarily took up full time employment elsewhere as a salesman and since then has permitted various other licensees or assignees (among them defendant Berman) to operate the stand for him.[1] He has been receiving no compensation from these operators but is allowing them to operate the stand with his permission until such time as he is able to sell it, with the informal understanding that the particular operator will have the first opportunity of buying it. Defendant never paid anything to the abutting property owner or other persons for the newsstand itself or the right to operate it at this location.

The newsstand is located approximately 22 feet north of the north curb line of Chestnut Street and 2½ feet west of the west curb line of 52nd Street, so that the stand is opposite the show windows and vestibule

---

[1] It is not contested that Berman severed his connections with Manlin on April 8, 1957.

of plaintiffs' premises and takes up approximately 40% of the width of the sidewalk at this point on 52nd Street. There is also a bus stop at this corner and buses pick up and discharge passengers at the curb directly to the rear of the newsstand.

On Saturday nights additional portions of the sidewalk in front of plaintiffs' entranceway and adjacent to the newsstand are used for the storage of the Sunday editions of the Philadelphia papers.

All of the operators of the newsstand have used the vestibule of plaintiffs' premises (within the building line) for the storage and sale of newspapers. On Sundays, with the knowledge and permission of *defendant,* certain persons have operated the newsstand by placing parts of same in the vestibule of plaintiffs' premises. No specific relief has been asked against this Saturday or Sunday use. No relief was granted by the court below or argued on appeal.

Prior to the institution of this action, plaintiffs requested defendant to remove his newsstand to the sidewalk on the Chestnut Street side of plaintiffs' premises which he refused to do.

The chancellor filed his adjudication and issued a decree nisi which dismissed plaintiffs' complaint in equity, reduced the size of the newsstand to a main newsstand 5 feet 9 inches long and a smaller stand and receptacle for debris and permitted the sale of newspapers, magazines, comic books and pocket books. Plaintiffs filed exceptions to the findings of fact, conclusions of law and adjudication of the chancellor, and a majority of the court en banc, including the chancellor, entered an order which modified the decree nisi so as to permit the defendant to operate and maintain a single newsstand 4 feet 11 inches in length at the base, 32 inches in width at the base, and 65 inches in height, extending upward in the rear to form a triangle with the base and containing a removable covering

from the height to the front of the base top; and enjoined him from adding or attaching any benches, boxes, racks, extensions, fixtures or other appurtenances to, at or near the aforesaid newsstand; and from maintaining any smaller stand of any type or nature whatsoever. It was provided therein that daily Philadelphia newspapers only should be sold, the sale of out-of-town newspapers, magazines, comic books and pocket books being prohibited. President Judge HAGAN filed an opinion dissenting from the dismissal of plaintiffs' exceptions and supporting the absolute prohibition of the newsstand.

Defendant has appealed from the order of the court en banc and plaintiffs subsequently filed their cross appeal.

The question has been raised initially as to whether the plaintiffs have followed the necessary procedural steps in bringing this lawsuit, in light of the Act of May 3, 1927, P. L. 515, §1, 17 P.S. §305.[2] That Act established that in certain situations involving encroachments on public sidewalks, a complaining citizen must first give written notice to the municipality

---

[2] The Act of May 3, 1927, P. L. 515, §1, 17 P.S. §305, provides as follows: "The courts of common pleas of the several counties of this Commonwealth, in addition to the powers and jurisdictions heretofore possessed and exercised, shall have the jurisdiction and powers of a court of chancery, so far as relates to the prevention, restraint, and abatement of encroachments on public sidewalks in front of residences, churches, hotels, apartment houses, or retail stores contrary to law and prejudicial to the interests of the community, upon the complaint of any municipality, or any citizen thereof, alleging injury thereby, without regard to whether or not such citizen has suffered damage or injury which is special to himself, where the said municipality has failed or refused to institute action for the prevention or restraint of such encroachments in front of residences, churches, hotels, apartment houses, or retail stores contrary to law, within thirty days after written notice thereof to such municipality by or on behalf of such citizen."

and allow the proper officials 30 days within which to act before such citizen may invoke the equity powers of a court of common pleas for relief against the encroachment.

The Act of 1927, as we read it, does not apply to the instant case. Prior to passage of the Act, courts of common pleas possessed the equitable power and jurisdiction to give relief against a sidewalk encroachment upon the complaint of either a municipality or a citizen who has suffered damage or injury special to himself. *Thomas v. Inter-County Street Ry.*, 167 Pa. 120, 31 Atl. 476 (1895); *Riley v. Pennsylvania Co.*, 32 Pa. Superior Ct. 579 (1907). The courts, however, did not have the equitable power to give relief to a citizen whose injury was not direct. *Rhymer v. Fretz*, 206 Pa. 230, 55 Atl. 959 (1903). The purpose of the Act, thus, as expressed both in its title[3] and in the main body of the statute,[4] is to grant *additional* equity powers to such courts in cases wherein the complaining citizen has *not* suffered damage or injury special to himself. In the latter situation, the Act provides that the citizen must give the municipality 30 days written notice, during which time the municipality must either fail or refuse to act, before instituting suit himself. The

---

[3] "Granting *additional* equity powers to courts of common pleas to prevent, restrain, and abate encroachments on public sidewalks in front of residences, churches, hotels, apartment houses, or retail stores contrary to law." (Emphasis supplied). Act of May 3, 1927, P. L. 515.

"The title and preamble of a law may be considered in the construction thereof. . . ." Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, §54, 46 P.S. §554. See *City Stores Company v. Philadelphia*, 376 Pa. 482, 487, 103 A. 2d 664 (1954); *Hoffman v. Pittsburgh*, 365 Pa. 386, 398, 75 A. 2d 649 (1950).

[4] ". . . the courts of common pleas of the several counties of this Commonwealth, *in addition to* the powers and jurisdictions heretofore possessed and exercised, shall have the jurisdiction and powers. . . ." (Emphasis supplied). Act of May 3, 1927, P. L. 515.

property owner who has suffered direct harm and who was always able to invoke the aid of the courts was not meant to be covered by this procedural requirement.

If the legislature had intended to set up a procedural roadblock for property owners who sustained an injury peculiar to themselves and different from that sustained by the general public, it would have done so expressly. We will not read such a requirement into the Act. Plaintiffs, claiming direct injury to their property rights by the existence of defendant's newsstand, were entitled to bring this action without prior written notification to the City of Philadelphia.

The theory upon which plaintiffs sought relief in equity was that defendant's operation of the newsstand constituted both a trespass and a nuisance. It appears from the record that 52nd Street was originally dedicated to public use in 1854 by deed of dedication and in 1901 it was widened as the result of condemnation proceedings. The newsstand appears partly on that land which was acquired by deed of dedication and partly on that part of the highway which was acquired by condemnation. In either case, the City did not acquire title to the fee. As to dedication, see *Hoffman v. Pittsburgh,* 365 Pa. 386, 75 A. 2d 649 (1950); *Sterling's Appeal,* 111 Pa. 35, 2 Atl. 105 (1886); *Versailles Township Authority v. McKeesport,* 171 Pa. Superior Ct. 377, 90 A. 2d 581 (1952). As to condemnation, see *William Laubach and Sons v. Easton,* 347 Pa. 542, 32 A. 2d 881 (1943); *Breinig v. Allegheny County,* 332 Pa. 474, 2 A. 2d 842 (1938); 3 Tiffany, Real Property, 3rd Edition, §924, p. 596.

The plaintiffs' contention is that since it is the owner of title, and since property taken by eminent domain passes only to the extent reasonably required for the purpose for which the power of eminent domain is exercised, *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 341, 54 A. 2d 277 (1947), and

since the sovereign acquires by condemnation only those rights for which it pays, *Miller v. Beaver Falls*, 368 Pa. 189, 82 A. 2d 34 (1951), the sidewalk may be used only for a public as distinguished from a private use. No private use may be made of the sidewalk in opposition to or over the objection of plaintiffs as owners. Their private right is superior to any other private right. It is conceded that the plaintiffs have title to the center of the street, *Scranton v. Peoples Coal Co.*, 256 Pa. 332, 335, 100 Atl. 818 (1917), subject only to an easement of public use.

While the easement acquired by the public in country roads is an easement of passage only, this is not true in Pennsylvania with respect to the public right in the streets of a city. These are regarded as in the exclusive possession of the municipality, which may authorize the use of the sidewalk, as well as the street, for *any public service*, without further compensation to the abutting lot owners. *William Laubach & Sons v. Easton*, 347 Pa. 542, 32 A. 2d 881 (1943) ; *McDevitt v. People's Natural Gas Co.*, 160 Pa. 367, 28 Atl. 948 (1894). Pursuant to the city's control, the sidewalks in Philadelphia have been utilized without the consent of the abutting property owners for a wide variety of public purposes, all of which are identified with a public service.[5] Certainly it could not be successfully asserted by an abutting property owner that unless he is paid rent or otherwise consents to such uses of the sidewalk, he is entitled to bar them.

What we must decide then, is whether defendant's use of the sidewalk through the maintenance of a stationary newsstand constitutes an authorized public use

---

[5] As illustration: Armed Forces Enlistment Posters, Bus Stop Areas and Markers, Fire and Police Boxes, Fire Hydrants, Mail Boxes, Parking Meters, Subway Entrances and Stops, Traffic Signals, Utility Poles, Wastepaper Receptacles, and more recently, Telephone Booths.

which takes priority over plaintiffs' private right. It is established beyond question that the sale and distribution of newspapers and other printed materials are such a public use as must be permitted on the sidewalks and highways of our nation. As stated by the Supreme Court of the United States in *Hague v. C.I.O.,* 307 U. S. 496, 515-516, 83 L. Ed. 1423, 59 S. Ct. 954 (1939) : "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

In the court below there was no dispute among the judges or counsel that the sale and distribution of newspapers on the sidewalks is protected by the constitutional guarantee of freedom of the press. As President Judge HAGAN, dissenting, stated in part, in answer to the question whether such sales constitute a lawful public use of the highways: "The answer to this question is clearly in the affirmative (a) because of the constitutional guarantees of freedom of speech and freedom of the press, which are among the fundamental privileges protected by the Fourteenth Amendment from invasion by State Courts: Lovell v. City of Griffin, 303 U. S. 444; and Marsh v. Alabama, 326 U. S. 501; (b) because of the settled State and Federal law that the principle of free press embraces distribution

and sale as well as publication: Winters v. City of New York, 333 U. S. 507; and Commonwealth v. Reid, 144 Pa. Superior Ct. 569; . . ."

Distribution as well as sale is protected even if it is upon sidewalks owned by a private corporation, *Marsh v. Alabama*, 326 U. S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946), or upon sidewalks owned by the municipality. *Jamison v. Texas*, 318 U. S. 413, 87 L. Ed. 869, 63 S. Ct. 669 (1943). The Supreme Court of the United States commented on this very point in *Marsh v. Alabama*, supra, in rejecting the contention that the property right of the corporation owning a company town justified prohibitions upon the distribution of literature. The Court said (326 U. S. at 506) : "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. . . ."

This, however, while it may affect our interpretive approach, does not control the central issue in the case. We begin with the basic proposition that a purely private use of the public highway with no reasonable benefit to the public generally not only may be prevented by the municipality, but is not even permissible. *Benner v. Junker*, 190 Pa. 423, 429, 43 Atl. 72 (1899) ; *Seibert v. Sebring*, 55 Pa. Superior Ct. 475 (1913). And while it is true that a free press is essential to the maintenance of liberty and it would be completely beyond the power of the state itself, let alone a municipality thereof, to prevent distribution on a public street, it does not necessarily follow that a governmental body may not regulate or even prevent the use of stationary newsstands for that purpose. Newsstands are neither essential nor even necessary for the distribution of newspapers. We can readily perceive that with large editions of the daily press filled with page

after page of advertisement that the newsstand is a convenience both to the distributor and to the purchaser—but it is equally clear that newsstands are not so necessary as to cloak them with the constitutional protection accorded a free press.

The decision in this case, thus, boils down to a very narrow issue. Has the use of stationary newsstands been sanctioned by the City of Philadelphia as being necessary for the dissemination of news and information to our citizenry? Although the custom of having newsstands in Philadelphia has existed for approximately 100 years, this custom is not enough to warrant such continuance. Whatever justification there is must be found in the rights of the public under sanction of law. The Superior Court correctly held in *Hindin et al. v. Samuel, Mayor, et al.,* 158 Pa. Superior Ct. 539, 542, 45 A. 2d 370 (1946): "No person, corporation or individual has the right to make a special or exceptional use of the public highway not common to all citizens except by grant from the sovereign power. Owl Protective Co. v. Public Service Commission, 123 Pa. Superior Ct. 382, 187 A. 229; Philadelphia Co. v. Freeport Borough, 167 Pa. 279, 31 A. 571. As this Court stated in Philadelphia v. Teller, 50 Pa. Superior Ct. 260, at page 265: 'The highways belong to the commonwealth in trust for the great body of the people, and he who claims a peculiar privilege to invade them must establish his right under some statute, or valid municipal regulation, ordained in pursuance of statutory authority. Livingston v. Wolf, 136 Pa. 519; Commonwealth v. Harris, 15 Phila. 10; Kopf v. Utter, 101 Pa. 27; Commonwealth v. Kembel, 30 Pa. Superior Ct. 199.' "

Subject to the paramount authority of the Commonwealth, the regulation and control of the streets belong to the city government. *Philadelphia Electric Co. v. Philadelphia,* 301 Pa. 291, 303, 152 Atl. 23 (1930). The

Commonwealth from an early date delegated to the City of Philadelphia broad power to permit and control reasonable encroachments upon the public sidewalks. The Act of April 16, 1838, P. L. 626, §3, 53 P.S. §16436, provides: "It shall and may be lawful for the select and common councils of the city of Philadelphia, from time to time, *by ordinance, to make and establish such and so many rules and regulations as to them may seem expedient,* for the better regulation of . . . [any] . . . device or thing . . . occupying the sidewalks or other portion of any of the streets, lanes and alleys; . . . ." (Emphasis supplied).

Referring to the cited Act in *Walnut & Quince Street Corp. v. Mills,* 303 Pa. 25, 31-32, 154 Atl. 29, 31 (1931), appeal dismissed 284 U. S. 573, 76 L. Ed. 498, 52 S. Ct. 16 (1931), this Court stated: "It is a settled principle that the legislature has the power of control over encroachments into or over public highways, from house line to house line, and this control may be delegated to municipalities in the State: Reimer's App., 100 Pa. 182, 185; Lenon v. Porter, 65 Pa. Superior Ct. 94, 98. As we stated in Reimer's App., supra, the councils of Philadelphia derive power to make rules and regulations in this regard from the Act of April 16, 1838, section 3, P. L. 626."

The Philadelphia ordinances prohibiting or restricting sidewalk sales or the use of stands on the sidewalks have long contained an express exemption as to the sale of newspapers, books and magazines. E.g., Ordinances of 1931, 1939, 1943, 1947, 1950, 1951 and 1954.

A like exemption has been carried into Section 9-205 of the Code of General Ordinances of the City of Philadelphia, effective February 29, 1956, relating to sidewalk sales. Subdivision (1) defines "Stands" as used therein, to mean any stand, showcase or other fixture used for the purpose of displaying, exhibiting or offering for sale any goods, wares or merchandise upon

the sidewalk, but subdivision (2) (b) expressly exempts from the provisions of the section: "The display, offering for sale and sale of books, magazines and newspapers, and the placing and maintenance of stands for such articles." And subdivision (3), while prohibiting the display or sale of any goods, wares or merchandise, or the placing or allowing of any stands to remain on the sidewalks of the streets designated therein, incorporates by reference the express exemption of the sale of newspapers, books and magazines and the placing and maintenance of stands therefor, as provided in subdivision (2) (b).

The question we now face directly is whether the exemption contained in these ordinances constitutes the requisite municipal sanction and a sufficient surrender of the public easement for a public use. Such authority must be by legislative grant in clear words or by unavoidable implication. *Riley v. Pennsylvania Co.*, supra. We hold, despite seemingly contrary language in *Tua v. Brentwood Motor Coach Co.*, 371 Pa. 570, 575-576, 92 A. 2d 209, 211-212 (1952),[6] that it does not.

[6] "In evaluating the social desirability of having news stands on street corners, it is appropriate to consider the legislative pronouncement of the Council of the City of Pittsburgh contained in Ordinance No. 375, December 24, 1934, which was introduced into evidence. The following sections are pertinent: 'Section Two. It shall not be lawful to put or place any box or boxes, barrel or barrels, or other articles that may tend to obstruct the free use of any sidewalk upon any of the sidewalks within the limits of the city, except articles temporarily placed thereon for the purpose of loading or unloading, removing or storing away.

" 'Section Three. The provisions of this ordinance shall not apply to the sale, storage, or display of newspapers or periodicals.'

"While the ordinance was obviously intended to expedite pedestrian traffic on sidewalks and was not directly concerned with the hazards created by such articles, it is at least evidence that the legislative body of the city was aware of the existence of stands like the one involved and sanctioned their continued use.

The *Tua* case was a negligence action by a pedestrian for injuries sustained when a heavy, metal newsstand on the sidewalk was struck by a passing bus and thrown against the plaintiff. In holding that a judgment n.o.v. should have been entered in favor of the Pittsburgh Newspaper Publishers Association, the owner of the newsstand, Justice STEARNE used the quoted language that defendants urge upon us as controlling. The language used, however, must be examined in its proper context. What the Court said in *Tua* was that the existence of such a newsstand did not violate any city ordinance and that its presence on the street corner was not contrary to law. The Court held that it was not negligence to put newsstands on city streets without their being fastened. The majority in *Tua*, however, did *not* decide nor did they have occasion to decide whether such a newsstand may be maintained in conflict with the rights of the fee-owner of the sidewalk. Reading the Court's language in its proper light, therefore, we find no authority for the proposition that there is legislative approval for stationary newsstands contained in the mere exemption for such newsstands from the penal sanctions of a regulatory ordinance.

It has also been argued that the re-enactment of this exemption several times in the past 28 years and the alleged reliance placed upon the contrary holding in *Wilson v. McGill*, 42 Pa. D. & C. 74 (1941) have indicated a legislative intent *not* to legislate in this area. More specifically, it is urged that the City Council of Philadelphia has impliedly indicated that newsstands are not in need of specific regulation or prohibition.

---

It is extremely unlikely that the city would have done so had it believed that such use involved an unreasonable risk. In any event, the importance of the press and of an efficient means of distributing newspapers among the populace of a large city are too apparent to require lengthy exposition."

That at least some of the newsstands in Philadelphia are in need of regulation is indicated by the findings of both the chancellor and the court en banc. In order for the City of Philadelphia to permit encroachments upon private property, however, even though they may be for a public purpose, we find it necessary that such authorization and sanction be express. As we have stated, plaintiffs, as fee-owner of the sidewalk, are entitled to possession free and clear of any encroachments. Plaintiffs' right, of course, is subject to the public easement and the right of the municipality to relinquish their easement for a public as distinguished from a private use. To so relinquish the public easement, however, it is only proper that we require the relinquishment to be done expressly and not by inference. Such authorization was clearly granted by ordinance in *Pickup v. Philadelphia & Reading Ry. Co.*, 29 Pa. Superior Ct. 631 (1905). Such authorization was not present in *Thomas v. Inter-County Street Ry.*, supra.

The city may be perfectly justified in concluding that a newsstand is the practical, sane solution to what otherwise would be an overwhelming problem in a heavily populated democratic community. Whether and how such newsstands shall be permitted is for the city and not the courts to decide.

In Chicago, where for a considerable length of time the sale and distribution of newspapers occasioned violence, a licensing and regulation procedure was adopted controlling the maintenance of newsstands on the public highways of the city.[7] Although we express no ap-

---

[7] "The ordinance (a) prohibits the sales from newsstands upon the public highway of any publication except daily newspapers printed and published in the City; (b) prohibits the maintenance of any newsstand upon any public highway without a permit from the Commissioner of Streets and Sanitation; (c) enacts regulations

proval of its substance, the Chicago ordinance demonstrates the detailed regulation which should characterize an enactment covering such an important matter. It should not be left to the courts. Since the City of Philadelphia, through council, has not seen fit by ordinance to either permit or regulate the erection and operation of newsstands on the sidewalks of the city, the lower court must be reversed.

We hold that plaintiffs, as fee-owner, may bring this action, and since the Act of 1927 is inapplicable, notification to the City of Philadelphia was unnecessary. Since defendants do not have permission to maintain the newsstand either from the City or from the fee-owner, the maintenance of such a newsstand constitutes a trespass upon plaintiffs' property and may be enjoined.

Decree reversed at cost of Defendant.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

For reasons hereinafter set forth, I would reverse the decree of the Court below, without any qualifications or reservations.

Defendant Manlin is the *absentee owner* of a very large permanent newsstand which he erected and maintains on the sidewalk of plaintiffs' private property. He asserts an *exclusive monopolistic right* to own, maintain and operate this newsstand (1) on the basis of public convenience and (2) under an ordinance of the City of Philadelphia, but principally (3) under the banner of "freedom of the press". Plaintiffs filed a bill in equity for a permanent injunction to restrain the maintenance and operation of the newsstand.

---

for the size and construction of the stand and its location upon the highway; and (d) vests general supervisory powers over newsstands in the Commissioner of Streets and Sanitation."

Plaintiffs undoubtedly have an interest and a status to bring this suit: *Thomas v. Inter-County Street Ry.*, 167 Pa. 120, 31 A. 476; *Riley v. Pennsylvania Co.*, 32 Pa. Superior Ct. 579; and of course Equity has jurisdiction.

The lower Court permitted defendants, their agents, employees or licensees to maintain the newsstand at its present location, but limited the defendant to the sale of daily Philadelphia newspapers; ordered the reduction of the newsstand to 4 feet 11 inches in length at the base, 32 inches in width at the base and 65 inches in height, and permitted a removable covering; and "in all other respects the complaint is dismissed". From this decree both plaintiffs and defendant Manlin* appealed.

The importance of the issues involved is strikingly emphasized by the fact that the Evening Bulletin, The Philadelphia Inquirer, The Philadelphia Daily News, Select Magazines, Inc. (national distributor of Time, Life and United States News and World Reports), Triangle Publications, Inc. (publisher of TV Guide), United News Company (Philadelphia area distributor of the New York Times), and the Bureau of Independent Publishers and Distributors filed briefs under Rule 46 of this Court and their counsel were permitted oral argument.

Oscar Manlin started as a boy to sell newspapers in front of plaintiffs' premises in 1932. In that year defendant Manlin requested and received permission from the *then* owner of 46 South 52nd Street to operate a small newsstand about 4 feet long, 24 inches wide and 5½ feet high. Since then Manlin has gradually added various racks, additional stands and benches to his original newsstand, so that at the time of the com-

---

* Defendant Berman no longer sells for Manlin and the record does not disclose who does.

mencement of the present action in November 1956, Manlin's original newsstand was extended to include two newspaper stands, several benches and racks, and a magazine stand, which measured 9 feet 4¼ inches in length, 4 feet 1 inch in width, and 6 feet 3 inches in height. Manlin sells from this newsstand six or seven different newspapers, approximately 300 different magazines, various comic books, many pocket books, and several racing forms. Approximately 40% of the physical space of the newsstand is devoted to the sale of newspapers, and 60% to magazines, comic books and pocket books. The newsstand is located on the northwest corner of 52nd and Chestnut Streets which has a sidewalk 14 feet 8 inches in width. The present newsstand occupies approximately 40% of the width of the sidewalk which is owned by plaintiffs, and over which the public has an easement of travel.

In 1953 plaintiffs commenced to remodel their 52nd Street store by leasing the adjoining premises next door and the premises to the rear, breaking down the adjacent walls between the three premises and creating a new single front store at a cost of $60,000, of which $15,000 was attributable to the new store front on 52nd Street. Manlin's newsstand was directly in front of plaintiffs' show or display window. Plaintiffs spend $5,000 annually for decorating and arranging displays in this window. Shortly after the window was built, plaintiffs demanded that defendant Manlin remove his newsstand. Manlin does not pay and never has paid any rent to anyone for the privilege of erecting or maintaining his newsstand which he expects to sell for several thousand dollars. This is a heavily traveled corner—in addition to the traveling and buying pedestrian traffic, there is a bus stop in front of plaintiffs' property and 145 buses, as well as very many automobiles, pass by plaintiffs' property during each day.

There is no controversy or dispute in this case as to the right of Manlin (or defendant Berman, who no longer operates the newsstand) to sell newspapers on this sidewalk. The real dispute involves Manlin's right to maintain, *without the consent* of the owner of the property *and without compensation* to the owner or to anyone, his aforesaid newsstand (a) which undoubtedly materially curtails throughout the entire day and evening plaintiffs' rights to have the public and prospective customers, who ride or walk by and wish to window-shop, critically view and appraise (without impeding sidewalk traffic) merchandise in plaintiffs' valuable display window and (b) which undoubtedly violates plaintiffs' constitutionally guaranteed right of private property.

Newspapers have become an almost indispensable part of the life of a vast majority of the American people. The word "newsboys" (even though inaptly applied to present-day adults) has had for a hundred years such a friendly connotation, and newsstands for the sale of newspapers are such a convenience to the buying public during rush hours in a few corners or spots in Philadelphia (and in some other large cities)* that nearly everyone starts with a predilection in favor of newsboys and newsstands. However, in interpreting the Constitution and the Law, Justice knows neither friend nor foe, rich nor poor, powerful nor powerless.

---

* In most of Pennsylvania so-called newsboys are non-existent, and even in large cities they usually appear only at a relatively few spots and even there, usually only at rush hours. There is never any difficulty in buying newspapers, magazines and books in stores, stations, hotels and elsewhere. It is conceded by everyone that in other municipalities in Pennsylvania newsstands do not exist, and there has been no complaint that dissemination of information has been hampered thereby; or that newspapers are not and cannot be sold on the sidewalks of a large city without a newsstand.

The province and the duty of the Courts is to interpret and defend the Constitution—not to disregard or re-write it in accordance with our predilections or sympathies, or even with the popular wishes of the people.

To determine the issues involved we must examine (1) the rights of this property owner, (2) the rights of the so-called newsboy, (3) the Constitution, and (4) the decisions of the Supreme Court of the United States and of Pennsylvania which interpret, define, circumscribe and limit the words "Freedom of the Press". Some of these questions overlap, so they may be considered together.

### Plaintiffs Have Constitutionally Guaranteed Property Rights In This Sidewalk

One of the most important and fundamental rights ordained and guaranteed by the Constitution of Pennsylvania and by the Constitution of the United States is the inherent and indefeasible right to acquire, possess and protect property; property cannot be taken *even for public use* without the payment of just compensation: Article I, §1 and §10; Article XVI, §8 of the Constitution of Pennsylvania; Fifth and Fourteenth Amendments to the Constitution of the United States. It is indisputable that (in Pennsylvania) an owner of property abutting on a public street owns to the center of that street* including, of course, the sidewalk. The owner's property rights therein and thereto are subject only to *a public easement of passage,* and a reasonable and valid exercise of the police power in the *public* interest.** In *Westinghouse Electric Corp.*

---

* In the absence of a specific vesting of a fee in the City by grant, purchase or condemnation.

** A City, unlike a suburban governmental unit, has the right to use the streets below the surface for sewers, gas and water pipes for health and other sanitary reasons: *McDevitt v. Gas Co.,* 160 Pa. 367, 28 A. 948; *Provost v. Water Co.,* 162 Pa. 275, 29 A. 914.

*v. United Electrical, Radio & Machine Workers,* 353
Pa. 446, 46 A. 2d 16, the Court said (page 455) : ". . .
ordinarily the title to property abutting on a public
highway extends to the center of the highway, the
sidewalk being for all intents and purposes a part of
the owner's premises *subject only to the public's ease-
ment of passage*:\* Duquesne Light Co. v. Duff, 251
Pa. 607, 97 A. 82; Scranton v. Peoples Coal Co., 256
Pa. 332, 335, 100 A. 818, 819; Breinig v. Allegheny
County, 332 Pa. 474, 477, 478, 2 A. 2d 842, 845, 846;
Hindin v. Samuel, Mayor, 158 Pa. Superior Ct. 539,
542, 45 A. 2d 370, 372." See also to the same effect:
*Seibert v. Sebring,* 55 Pa. Superior Ct. 475; *Reighard
v. Flinn,* 189 Pa. 355, 42 A. 23.

When we draw back all the glittering tinsel with
which this case has been draped, we discover that de-
fendant Manlin and the news-publishers (amici curiae)
contend that "public convenience" or "public neces-
sity", as well as Freedom of the Press, gives a squatter
and a trespasser *an exclusive monopolistic* and perma-
nent right to erect and maintain on the sidewalk of
another man's property—*without consent or compen-
sation*—a large permanent newsstand. We often for-
get that newspapers are privately owned, privately pub-
lished, and are operated for private profit. Newsstands
are likewise privately owned and are operated for pri-
vate profit. They are a private convenience, not a pub-
lic necessity, and in virtually every instance are per-
mitted by the consent of the owner of the sidewalk.

" ' "We are in danger of forgetting that a strong
public desire to improve the public condition is not
enough to warrant achieving the desire by a shorter cut
than the constitutional way of paying for the change":
Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416' ":
*Lord Appeal,* 368 Pa. 121, 130, 81 A. 2d 533.

---

\* Italics throughout, ours.

## Freedom Of The Press Is Not Absolute

The principal contention of Manlin and of all the news-publishers amici curiae is that a newsstand is protected by Freedom of the Press. The most highly prized freedoms in our Country are freedom of religion, freedom of speech, and freedom of the press.* These three freedoms plus "the inherent and indefeasible right . . . of enjoying and defending life and liberty, of acquiring, possessing and protecting property . . ."; and "the right of free elections"** have been the hallmarks of free English-speaking peoples. These are the freedoms which have distinguished us from peoples living under Communism, Fascism or Totalitarianism. Moreover, the basic right to personally own, possess, use, and enjoy private property and the increments and fruits thereof is the main difference between Western (oft-called) democratic Society and Socialism.

The first amendment to the Constitution of the United States provides: "Congress shall make no law . . . abridging the freedom of speech or of the press . . . ." Article I, §7 of the Constitution of Pennsylvania provides: "The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof . . . . every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

It is an often overlooked truism that neither freedom of speech nor freedom of the press is absolute and

---

* A history of Freedom of the Press, its slow rise for several centuries until it attained its present gigantic stature, is briefly traced in my Opinion in *Mack Appeal*, 386 Pa. 251 (page 261), 126 A. 2d 679.

** The right to free and equal elections is seemingly of less importance, judging from the percentage of people who, although exhorted to vote, do not avail themselves of the fundamental right which peoples of other countries lack, but long for.

unlimited: *Poulos v. New Hampshire,* 345 U. S. 395; *Beauharnais v. Illinois,* 343 U. S. 250; *Garner v. Los Angeles Board,* 341 U. S. 716; *Dennis v. United States,* 341 U. S. 494; *American Communications Assn. v. Douds,* 339 U. S. 382; *Kovacs v. Cooper,* 336 U. S. 77; *United Public Workers of America v. Mitchell,* 330 U. S. 75; *Whitney v. California,* 274 U. S. 357; *Gitlow v. New York,* 268 U. S. 652; *Gilbert v. Minnesota,* 254 U. S. 325; *Schenck v. United States,* 249 U. S. 47; *Frohwerk v. United States,* 249 U. S. 204; *Debs v. United States,* 249 U. S. 211; *Abrams v. United States,* 250 U. S. 616; *Pierce v. United States,* 252 U. S. 239; *Schaefer v. United States,* 251 U. S. 466; *Fitzgerald v. Philadelphia,* 376 Pa. 379, 102 A. 2d 887; *Wortex Mills, Inc. v. Textile Workers Union,* 369 Pa. 359, 363, 85 A. 2d 851; *Commonwealth v. Geuss,* 168 Pa. Superior Ct. 22, 76 A. 2d 500, 368 Pa. 290, 81 A. 2d 553; *State of Ohio v. Clifford,* 123 N.E. 2d 8; *Mack Appeal,* 386 Pa. 251, 262, 126 A. 2d 679. See also Rule 53 of the Federal Rules of Criminal Procedure, promulgated by the Supreme Court of the United States* which prohibits the taking of photographs in a Courtroom during the progress of judicial proceedings, and radio broadcasting of judicial proceedings from the Courtroom. See also Rule 223(b), Rules of Civil Procedure, which make it mandatory upon the trial Court to exclude from the Courtroom the taking of photographs or moving pictures, or the transmission of communications by telegraph or telephone or radio, during the trial of actions.

The publications and circulation, as well as a reasonably conducted sale on the streets and sidewalks of a municipality, of newspapers, leaflets, pamphlets and, I believe, in connection therewith, magazines are lawful—certainly the prohibition or attempted licensing

---

* Title 18, U.S.C.A., page 598.

thereof by a State or Municipality would be a violation of freedom of speech and of freedom of the press: *Lovell v. City of Griffin,* 303 U. S. 444; *Hague v. C.I.O.,* 307 U. S. 496; *Schneider v. Town of Irvington,* 308 U. S. 147, 157; *Cantwell v. Connecticut,* 310 U. S. 296; *Grosjean v. American Press Co.,* 297 U. S. 233, 245-50; *Marsh v. Alabama,* 326 U. S. 501; See also: *Jamison v. Texas,* 318 U. S. 413; *Winters v. New York,* 333 U. S. 507; *Murdock v. Pennsylvania,* 319 U. S. 105; *Follett v. McCormick,* 321 U. S. 573; *Commonwealth v. Reid,* 144 Pa. Superior Ct. 569, 20 A. 2d 841.

In *Marsh v. Alabama,* 326 U. S., supra, the Court said (pages 504-5) : ". . . Under our decision in Lovell v. Griffin, 303 U. S. 444 and others which have followed that case, neither a State nor a municipality *can completely bar* the distribution of literature containing religious or political ideas on its streets, sidewalks and public places, or make the right to distribute dependent on a flat license tax or permit to be issued by an official* who could deny it at will. We have also held that an ordinance completely prohibiting the dissemination of ideas on the city streets cannot be justified on the ground that the municipality holds legal title to them [in Texas]. Jamison v. Texas, 318 U. S. 413."

In *Jamison v. Texas,* 318 U. S., supra, the Court said (page 416) : ". . . But one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word. Hague v. C.I.O., supra; Schneider v. Irvington, 308 U. S. 147, 162 . . . .

---

* In its discussion of ordinances, I believe the majority have overlooked this language and its significance, as well as the rulings in the *Lovell* and *Grosjean* cases, supra.

". . . The right to distribute handbills concerning religious subjects on the streets may not be prohibited at all times, at all places, and under all circumstances. This has been beyond controversy since the decision in Lovell v. Griffin, 303 U. S. 444."

In *Lovell v. Griffin,* 303 U. S., supra, the Court said (page 452) : "The ordinance [requiring a permit] cannot be saved because it relates to distribution and not to publication. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Ex parte Jackson, 96 U. S. 727, 733. The license tax in Grosjean v. American Press Co., supra, was held invalid because of its direct tendency to restrict circulation."

The decisions of the Supreme Court and of this Court may be thus summarized : Freedom of the press means the right to freely and fearlessly publish and criticize (on proper occasions), as well as circulate and sell news of public officials and private persons, of events, of thoughts and beliefs, as well as news of every description, but it is subject to the limitations set forth or delineated in the aforesaid authorities, and everyone is responsible for an abuse of this Freedom.

It is clear that a newsstand, even by Procrustean stretch, is not such a structure as is encompassed within and protected by the Constitutionally guaranteed area of Freedom of the Press.

## Public Convenience

Defendant attempts to justify this huge newsstand on plaintiffs' property on the basis of public convenience. Public convenience creates no legal right. Public convenience and public necessity, which are used interchangeably by defendant and the amici curiae, are neither actually nor legally synonymous. This is one of their many misconceptions. The majority does not fall into the same error. The City in a justifiable exer-

cise of the *police power,* erects or permits for the benefit of the general public, fire hydrants, fire and police boxes, mail boxes, utility poles, parking meters, wastepaper receptacles and traffic signals. These are obviously public necessities; they are for the benefit of the general public; they exist for the safety or health and benefit of the public; they are not monopolistic and exclusionary; and property owners do not and cannot object or complain. They are clearly distinguishable from a monopolistic and exclusionary newsstand which serves primarily the private interest of the owner of the newsstand and only incidentally the convenience of the public (at a few locations at rush hours), and as the majority admits, is certainly not a public necessity. Manlin and others overlook the crucial fact that when a news vendor asserts a right to maintain a permanent newsstand upon the sidewalk, he is not claiming or making *public* use of the sidewalk *in common with all other members of the public,* but he is claiming an absolute and exclusionary right to appropriate a particular segment of the sidewalk for his own private and exclusive use and profit. The newspaper public can be adequately served by buying at nearby stores, hotels, stations, etc., and by several newsboys selling on or near any busy street corner (or any other location), instead of by an exclusionary monopolistic "grab" of one or more busy corners by one owner of one or a number of newsstands, or by a municipal grant to one or a few newsboys to erect and maintain a newsstand on the property of a private citizen in violation (1) of the Constitutional rights of the property owner, and (2) of the rights of every other Philadelphia newsboy.*

* If a newspaper and a so-called newsboy wish to make an exclusive agreement inter se for the sale of a newspaper, that may be valid inter se but it cannot affect or violate the rights of the public nor the Constitutional rights of an owner of property. That question is not involved in this case.

Defendants contend that if a newsstand were not allowed, a number of competing newsboys would sell newspapers on or near certain rush-hour street corners on week days (newsboys are almost non-existent on Sundays) and they would "impede the free flow of travel upon the public sidewalks". Since when has competition become anathema in America? Haven't any other newsboys except the owner of a trespassing newsstand any right to sell newspapers upon the public sidewalks, or is that corner *and all the neighboring public sidewalk* reserved solely for the owner (or in this case the absentee owner) of a newsstand? Nearly everyone who has passed newsboys at rush hours, or outside a football stadium just before a football game, even when they sell a few yards apart, knows that they do not interfere with the hundreds or thousands of rushing home-goers or sport fans*—certainly they do not block the free flow of travel upon the public sidewalk as much as does defendants' huge newsstand. The language of the Superior Court in *Hindin v. Samuel, Mayor,* 158 Pa. Superior Ct., supra, is particularly appropriate (page 542) : "In Pennsylvania it is well established that the title to property abutting on a public street extends to the center of that street. Scranton v. Peoples Coal Co., 256 Pa. 332, 100 A. 818. The public acquires an easement in the highway; the fee of the land remaining in the owner subject to the easement and the land may be used by the owner for any purpose not inconsistent with the easement acquired by the public. Duquesne Light Co. v. Duff, 251 Pa. 607, 97 A. 82. No person, corporation or individual has the right to make a special or exceptional use of the public highway *not common to all citizens* except by grant

---

* Moreover, they readily sell to 10,000-70,000 people (outside a stadium) newspapers without a newsstand. We note parenthetically that the fine bulky Sunday newspapers are rarely sold in Philadelphia by newsboys.

from the sovereign power. Owl Protective Co. v. Public Service Commission, 123 Pa. Superior Ct. 382, 187 A. 229; Philadelphia Co. v. Freeport Borough, 167 Pa. 279, 31 A. 571."

## No Custom

I agree with the majority that what defendant describes as a 100 year old Philadelphia custom of having newsstands "is not enough to warrant such continuance". Defendant never attempted to prove *any* custom, let alone a "legal custom".* The reason is obvious—defendant would have had to establish the length, width, height, size and location of the "customed" newsstands, and most important of all, that they existed and were maintained *without the consent of the owner* of the property and without any rent or compensation to the owner.

## Discrimination Between Local And Out-Of-Town Newspapers Is Unconstitutional

The Decree of the lower Court which permitted the sale on public sidewalks in Philadelphia "of daily Philadelphia newspapers" and prohibited the sale of "out-of-town newspapers, magazines . . . and other types of printed matter", was undoubtedly discriminatory and invalid, and violated the First and Fourteenth Amendments to the Constitution of the United States and Article I, §7 of the Constitution of Pennsylvania.

## The City's Ordinance

I also agree with the majority that this newsstand is not authorized by the City's Ordinance.

---

* 3 Tiffany, Real Property, 3rd Edition, §935, Customary Rights. Cf. also: *Lancaster Transportation Company v. New York & N.B.A. Express Co.*, 187 Pa. Superior Ct. 621, 623, 146 A. 2d 150; *Adams v. Pittsburg Insurance Co.*, 76 Pa. 411, 414.

Defendant Manlin contends that the Code of General Ordinances of the City of Philadelphia (effective February 29, 1956) constitutes a permission or license to erect and maintain a huge newsstand on this sidewalk. The Code prohibits from the sidewalks all goods, wares and merchandise in certain designated areas of Philadelphia, but (in §9-205) exempts from its application "the display, offering for sale and sale of books, magazines and newspapers, and the placing and maintenance of stands for such articles". Plaintiffs contend on the other hand, inter alia, (a) that the City must not only grant permission for but must specifically regulate newsstands in order to validate this newsstand; and (b) that the exemption of newsstands from the City's ordinance is not such an affirmative grant and regulation as to legally authorize the erection of this large permanent newsstand on plaintiffs' sidewalk. However, I am convinced that the majority has overlooked the two most important rights which are here in issue—(1) the Constitutionally guaranteed right of the owner of the property (the sidewalk); and (2) the easement of public passage over City sidewalks, which can be *reasonably* regulated by City Council only for the public and not for a private interest.

To summarize: The property owner has a fee simple interest in the land and its sidewalk; the public have a public easement of (pedestrian) passage over the sidewalk, which is an interest in land (generally) known as an incorporeal hereditament. Each in its own sphere or interest is supreme, and neither has a legal right to encroach upon or destroy the other's interest. For example, a property owner cannot permit or lease a newsstand on his own sidewalk if a newsstand is prohibited by the City in the interest of the traveling public. Sidewalks are subject to the police power and to reasonable municipal regulations, but when these regulations govern the public easement of

traffic they must be primarily for the benefit of the public and not for the benefit of a particular private individual who conducts (without rent to anyone) a private enterprise for his own benefit. This easement of passage cannot be diverted to another purpose or enlarged* by the public or by the municipality to impinge upon or to violate, without the owner's consent or without paying compensation therefor, a property owner's Constitutionally guaranteed right of property. Furthermore, the City cannot, under the guise of public interest, give an exclusive monopolistic private right to one so-called newsboy and exclude all other newsboys and members of the public who may desire to own or operate a newsstand on this or adjoining properties.**

Plaintiffs further contend that this large newsstand amounts to a nuisance to their very large display win-

---

* In Restatement of the Law of Property, The American Law Institute thus states the law: "b. Nonpossessory interest. An easement is an interest in land in the possession of another. It is not, itself, a possessory interest. The owner of it, therefore, is not entitled to the protection which is given to those having possessory interests. The fact that the owner of an easement is not deemed to have a possessory interest in the land with respect to which it exists indicates a lesser degree of control of the land than is normally had by persons who do have possessory interests. Thus, a person who has a way over land has only such control of the land as is necessary to enable him to use his way and has no such control as to enable him to exclude others from making any use of the land which does not interfere with his."

** Concern has been expressed over what may happen to small newsstands which are sometimes located on the pavement outside a central office building or station or store in the commercial part of a large City. In this very case plaintiffs offered to let defendant erect a reasonable newsstand on the Chestnut Street side of their store, where there is no display window. So far as the record shows or our research has disclosed, no complaint has ever been made about a small newsstand on a sidewalk, but if it were, Constitutional rights would have to prevail.

dow. The lower Court found that it was not a nuisance, although it unquestionably partially blocks the view of prospective buyers who ride by this populous corner in automobiles and buses, and to some extent interferes with prospective shoppers who wish to window shop. The finding of the lower Court that the newsstand did not amount to a nuisance was not a finding of fact, as Manlin contends, but an inference or conclusion. This Court is equally qualified to draw inferences and make conclusions from the actual facts, and to determine whether this huge newsstand, which partially blocks plaintiffs' display window day and night, constitutes a nuisance: *Eways v. Reading Parking Authority*, 385 Pa. 592, 124 A. 2d 92, and cases cited therein. I would hold that under all the facts present in this record, it amounts to a nuisance.

I find no merit in any of Manlin's contentions and I would reverse the Decree of the lower Court and enter an injunction to restrain the maintenance and operation of Manlin's newsstand.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Braits own and operate a men's clothing store at 46 South 52nd Street in Philadelphia. Immediately in front of the store, the defendant Oscar Manlin maintained on the sidewalk from 1932 to 1954 a newsstand which, conversely to the story of the Ugly Duckling, grew from an attractive little boy's cart into a misshapen, ugly monstrosity of a shack which measured 9 feet 4¼ inches in length, 6 feet 3 inches in height, and 4 feet 1 inch in width. It sprawled over 40% of the sidewalk, obstructing the view of the Braits' show windows and impeding the movement of customers desiring to patronize the store.

Resting on various levels and racks and hanging from hooks and other contrivances of this ungainly

structure were displayed newspapers, 300 different kinds of magazines, alleged comic books, paper back editions of standardized books, and sheets, known as racing forms. In 1954 Manlin left his shack behind him and took up full time employment elsewhere. Other people have operated the business since he left.

In November, 1956, the Braits filed a suit in equity to enjoin Manlin and a man named Theodore Berman (who was then operating the stand but has since dropped out of the picture), from carrying on a business at the place indicated. Manlin opposed the action by averring that the right to maintain a kiosk at 46 South 52nd Street is his exclusively and that he may sell that right to others. He testified at the trial that he is presently in the market for bidders to purchase this alleged privilege from him.

The Court below was apparently impressed with Manlin's arguments and refused the injunction sought by the Braits, although it ordered a reduction in the size of the newsstand, and limited sales to Philadelphia newspapers. The plaintiffs appealed from the decree denying injunctive relief and the defendant appealed from that part of the decree which prohibited the vending of out-of-town newspapers, magazines, and books.

No one can dispute that newspapers are essential to the life of a community because, without knowledge as to what is transpiring, the people meet in a windowless and unlighted hall to assert their rights as citizens of a democracy. Nor may the sale of newspapers be limited to local newspapers. A newspaper is a newspaper and, regardless of point of origin, its sale, consistent with security and health regulations, may not be enjoined anywhere.

But while books also come under the protection of Freedom of the Press, their sale at newspaper stands is something different. While they are indubitably essential to the intellectual and cultural progress of the

people, they are not so momentarily and immediately needed that pedestrians must purchase them as they hurry along the streets on their important errands of the hour or day.

The spontaneous need of the public for books is not so vital that it cancels out the rights of a property owner who is entitled to space in front of his business establishment for the accommodation of prospective customers who would like to observe his window displays before purchasing.

Today an ever-increasing quantity of books are becoming encyclopaedic in size. At the oral argument one of Manlin's attorneys was asked if he would contend that on the basis of the right to sell, Manlin could put on display sets of the Encyclopaedia Britannica. The attorney replied that he would not assert that kind of a privilege because an encyclopaedia is not a current book, but who is to determine whether a book is current or not?

It was also argued, in behalf of the defendant, that the only books sold at the Manlin kiosk were pocket books which are paper back editions of hard cover books. However, it must be apparent to anyone that many of the so-called paper books are themselves assuming such proportions that it is absurd to think that anyone, outside of a kangaroo, would have a pocket large enough to comfortably carry such books.

It cannot be denied that the public has an easement of passage over the sidewalks at South 52nd and Chestnut Streets, nor can it be controverted that the public has the right to buy newspapers at this point. Thus, if newspapers may be purchased here, perforce they must be sold here. But Manlin is not selling newspapers on the sidewalk at South 52nd and Chestnut Streets. He asks this Court to decide this lawsuit in his favor on the proposition that he has the right to dictate *who* shall sell newspapers there. If the law

were to recognize such a right, it would be a body blow to Freedom of the Press. Under such a right, an aggressive and rapidly moving entrepreneur could dominate a large part of the city through the process of quickly installing stands at various corners and then holding off newspaper publishers from delivering papers to such corners unless they would meet such demands as he might make. It is enough merely to state such a hypothesis in order to demonstrate its incompatibility with the concept of Freedom of the Press.

To uphold Manlin's position would mean that a vendor of newspapers at a certain corner could give up his stand and then, years later, return to dispute the right of another vendor to sell newspapers at that same corner. To allow such control after voluntary abandonment would be to introduce grave disorder into the regular sale and distribution of newspapers, a business acknowledged by law to be a matter of public necessity.

In comparing the respective rights of the parties in this controversy the chancellor said: "No injunction should be issued because the injury to Braits, if any, is slight, whereas the damage to the defendant caused by a restraining order might well be substantial and irreparable—certainly out of all proportion to the benefits which the plaintiff might derive from the issuance of such order." But it is not a matter of comparison of rights. Manlin has no authority at all on the sidewalk except that which he enjoys with the whole public. He may walk on the sidewalk, he may linger on it, he may window-shop from it, he may sell newspapers from it but he may not stake out from it a large space and call it permanently his own.

And then, even if it may be assumed that because a news-vendor has sold newspapers at a particular corner for a long time he has priority over a newcomer who challenges his place, he certainly cannot dictate

who is to sell newspapers at that corner after he has abandoned it.

The final decree issued by the court below carried the astonishing provision that Manlin could maintain the establishment on the sidewalk at South 52nd and Chestnut Streets through his "agents, employees or licensees." In other words he was given a permanent proprietary right in the sidewalk, a proposition which finds no support or even shadow of support in all the lawbooks of the land. If Manlin can sell a so-called privilege or right in a business on a public sidewalk, what is to prevent him from asserting a privilege to cut flowers in a municipal conservatory to vend at a profit? Why may he not have a right to sell the shade under oak trees growing in Fairmount Park?

The lower court in its adjudication did not specify how long Manlin's shadow was to cast its obscuration over the Brait property, so that, according to the lower court, it could go on indefinitely. Thus, Manlin, who does not live at 46 South 52nd Street, does not work there, owns no property there, possesses no easement there, would yet have a continuing proprietary right there. This would be an authority, since it was not limited in time, which would know no sunset and suffer no eclipse. No matter where Manlin might go, no matter how long he might live, he would always have the right to dominate the sidewalk at 46 South 52nd Street with his kiosk and its variegated contents.

The Majority of this Court has properly stated that Manlin has no such right, and of course, I concur in that conclusion. Unfortunately, however, the opinion filed by the Majority does not stop there. It goes on to assert that *no one* has the right to maintain a newsstand at 46 South 52nd Street, and then, like the North Wind, which does not heed its strength, it proceeds to blow all the newsstands in Philadelphia off the streets and sidewalks. The Majority's ruling in this respect is

alarming and shocking. It will invite chaos and turbulence into the orderly business of newspaper vending in Philadelphia; it will encourage a multitude of lawsuits because every property owner whose sidewalk is shadowed by a newsstand, large or small, will now be authorized to oust the newsvendor; it will set off fights between rival newsvendors for the more lucrative street corners; it will raise legal clouds of ambiguity and fogs of uncertainty over all the sidewalks in the cities of Pennsylvania. These sorry results are additionally melancholy to behold because they are entirely unnecessary, wholly uncalled-for, and not dictated by the slightest semblance of threat to existing institutions.

This Court has said many times that it will not go beyond the severely circumscribed boundaries of a lawsuit, as definitively marked by the pleadings and the evidence. In this case, however, the Majority has enlarged the scope of the lawsuit as a river breaks down its banks and inundates the surrounding country. The controversy which arose over the newsstand at one precise spot in Philadelphia will now spread like unrestrained storm waters to every newsstand corner in the City. If it does not, it will only be because of the restraint which will be exercised by the parties involved, and not because of any bridle placed by this Court upon the passions of ardent competitors.

There was only one question involved in this appeal and that was whether Manlin had the right to monopolize a piece of land to which he had no title whatsoever and from which he has now been absent for five years. That question, incidentally, the Majority has utterly failed to answer. It has not even discussed it. Instead of addressing itself to that issue, it proceeds to enunciate a decision which is wholly extraneous to the proceedings, and, worse yet, decides that extraneous question in a wholly illogical and unconstitutional fashion. The Majority Opinion says: "The decision in

this case, thus, boils down to a very narrow issue. Has the use of stationary newsstands been sanctioned by the City of Philadelphia as being necessary for the dissemination of news and information to our citizenry?" But the sanction of the City of Philadelphia for the use of stationary newsstands is not necessary under any statute and certainly not under the constitution.

The Majority Opinion says: "A purely private use of the public highway with no reasonable benefit to the public generally not only may be prevented by the municipality, but is not even permissible." This is a wholly irrelevant observation. Of course, no one may use the public highway for a private purpose unrelated to a reasonable benefit to the public. But that is not this case! We have here a *public use of the highway for the decided benefit of the public.*

The constitutional right to print a newspaper obviously includes the right to sell it, and the right of the public to buy the newspaper encompasses the right to obtain it without intervening physical barriers. The Majority concedes to newsvendors the right to sell newspapers on the city's sidewalks but would deny them the facility, lacking an agreement with the land proprietor, to maintain a newsstand from which to sell them.

The Majority's decision runs counter to a pronouncement of the Supreme Court of the United States on the subject under discussion. In the case of *Hague v. C.I.O.,* 307 U. S. 496, the highest Court of the land declared: "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of

the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; *but it must not, in the guise of regulation, be abridged or denied.*" (Emphasis supplied).

To deny the use of newsstands in Philadelphia is to abridge the rights of the citizens to be informed because, without newsstands, the distribution of newspapers to the transient public is made almost impossible. The Majority Opinion ignores realities. It draws the blinds of the windows facing the streets of Philadelphia where, it is quickly evident, the newspapers of today are so large and bulky that no person, short of a Goliath, can carry on his person at a busy street corner enough newspapers to satisfy the needs of the passing and hurrying throngs unless he is being constantly re-supplied with additional quantities. And where would those additional quantities come from? From a truck coming by every 10 or 15 minutes? And what would this do to traffic?

The daily Philadelphia newspapers are enormous compendiums of the world's news, supplemented by pictures, editorials, cartoons, columnar comment, together with advertisements, sporting pages, family pages, theatre, radio, television features, etc., etc. The Philadelphia Inquirer for Tuesday, November 5, 1959, contained 54 pages, the Philadelphia Bulletin for Monday, November 4, 1959, contained 72 pages. The Sunday editions of these papers are miniature libraries. The Philadelphia Inquirer of Sunday, November 1, 1959, contained 142 pages, plus 56 pages of magazine. The Sunday Bulletin contained 110 pages plus 72 pages of magazines. How tall would a newsvendor have to be and how long would his arms have to stretch to handle

more than a score or two each of these editions? And then what kind of a colossus would have to be recruited to manually vend the New York Times? The New York Times of Sunday November 1, 1959 contained 264 news pages and 248 pages of magazines pages.

Whether one likes it or not, some kind of a structure is indispensably required from which to sell the newspapers of today in a large city. The size of the newsstand, of course, is a matter of individual application. Once it goes beyond the needs of the transient newspaper buyers and takes on the aspect of a sprawling mercantile establishment, it transgresses constitutional rights and the abutting landowner may go into court for relief. Certainly a newsstand which, because of size, shape, location, maintenance or for any other reason, becomes a nuisance, can be enjoined as a nuisance. But to say that newsstands may not be permitted without the consent of the adjacent property owners is to curtail freedom of the press.

We have seen that, because of the magnitude of the Philadelphia and New York newspapers, it is physically impossible for a newsvendor to sell them from his person. Thus, unless he has something on which to rest the huge bulk of his newsprint, it will be impossible for the newsvendor to sell newspapers, and if the property owner may prevent the erection and maintenance of a suitable stand, the inevitable result will be that the public will be deprived of the privilege of purchasing newspapers at that particular point. This would create a situation which the Constitution would look upon with grave disapprobation and would give rise at once to Court action to compel the property owner to permit the use of a reasonable device to support the newspapers while they are in the process of being sold.

Considering the size of newspapers, as already discussed, the density of the traffic at 52nd Street and Chestnut Street, and the impossibility of having fresh newspapers hauled to the intersection at sufficiently frequent intervals to keep the newsvendors there constantly supplied so as to satisfy the passing public, it is obvious that a newsstand at 52nd and Chestnut Streets is a public necessity. It, of course, should not be any larger than is absolutely necessary to hold newspapers for immediate sale, and if the vendor transgresses in this respect the property owner should have immediate redress in court.

It would appear, in the hurly-burly existence of this unphilosophical age, that consistency is no longer the jewel it used to be, so that one should not be too much disappointed if he finds the Majority Opinion in this case laying down propositions which it later flatly contradicts. For instance, it says: "Whether and how such newsstands shall be permitted is for the city and not the courts to decide." Then, after making that statement, it proceeds to *decide* that newsstands shall not be permitted in Philadelphia. Although it says that the Courts should not decide whether and how newsstands should be permitted in Philadelphia, it proceeds to cite Chicago legislation as a demonstration of the "detailed regulation which should characterize an enactment covering" newsstands in Philadelphia.

Still ignoring the shining gem of consistency, the Majority Opinion quotes Pennsylvania legislation which already authorizes the use of newsstands on the streets of Philadelphia and then says that legislation to that effect is imperatively required.

The Majority Opinion calls to our attention the Act of Assembly (April 16, 1838, P. L. 626) which empowers Philadelphia to pass ordinances to regulate reasonable occupation of the sidewalks. The Majority Opinion reminds us of a decision of this Court which

affirms this right on the part of Philadelphia to legislate regarding sidewalks: *Walnut & Quince Street Corp. v. Mills,* 303 Pa. 25. The Majority Opinion then tells us how, acting under that authority, the City of Philadelphia, by Section 9-205 of the Code of General Ordinances of the City of Philadelphia (1956) provides that: " 'the display, offering for sale and sale of books, magazines and newspapers, and the placing and maintenance of stands for such articles' " shall be exempt from restrictions on the use of sidewalks.

The Majority Opinion then goes on to say: "And subdivision (3), while prohibiting the display or sale of any goods, wares or merchandise, or the placing or allowing of any stands to remain on the sidewalks of the streets designated therein, incorporates by reference the *express exemption of the sale of newspapers, books and magazines and the placing and maintenance of stands therefor,* as provided in subdivision (2) (b)." (Emphasis supplied.)

And then, after laboriously and extensively citing all these authorities which definitively declare that the law specifically exempts newsstands from prohibition against stands on the city sidewalks, the Majority asks itself: "The question we now face directly is whether the exemption contained in these ordinances constitutes the requisite municipal sanction and a sufficient surrender of the public easement for a public use."

But what further sanction is required? What else can the City Council of Philadelphia do which it has not already done to show that it authorizes and permits newsstands on city sidewalks? The Majority says: "Such authority must be by legislative grant in clear words or by unavoidable implication." How clearer can words be than those in the cited code?

An exemption is often of greater authoritative effect than an outright grant because the exemption as-

sumes that the right therein saved is one which ante-
dates the announcement of a numerous prohibition. For
instance, The Vehicle Code which restricts speed on
the Pennsylvania highways to a certain maximum of
miles per hour exempts police cars and ambulances
from those limits because, obviously, the security of
the State and the life and health of its citizens are
inherent rights which surpass regulations governing
everyday activities. Thus, also, the exemption of news-
stands from the limitations on the use of sidewalks are
obvious constitutional rights which are mentioned only
as a reminder and not because they need to be ex-
pressed in order to denote legality.

There are many other exemptions from restrictions
on the use of sidewalks which do not require specific
legislative grants in order to become legal. Certainly
the Majority would not require specific legislative
grants to establish the legality of using sidewalks for
fire hydrants, fire and police boxes, mail boxes, traffic
signals, subway entrances and stops, utility poles,
wastepaper receptacles, bus stop areas and markers.

The Majority cites with approval the case of *Tua v.
Brentwood Motor Coach Co.*, 371 Pa. 570, and then, con-
tinuing to drop overboard the pearls of consistency, ig-
nores the very language which it quotes from that de-
cision. In that case, Justice STEARNE, speaking for the
Supreme Court, said: "In evaluating the social desira-
bility of having news stands on street corners, it is ap-
propriate to consider the legislative pronouncement of
the Council of the City of Pittsburgh contained in Or-
dinance No. 375, December 24, 1934, which was intro-
duced into evidence. The following sections are per-
tinent: 'Section Two. It shall not be lawful to put or
place any box or boxes, barrel or barrels, or other ar-
ticles that may tend to obstruct the free use of any
sidewalk upon any of the sidewalks within the limits
of the city, except articles temporarily placed thereon

for the purpose of loading or unloading, removing or storing away.

" 'Section Three. The provisions of this ordinance shall not apply to the sale, storage, or display of newspapers or periodicals.'

"While the ordinance was obviously intended to expedite pedestrian traffic on sidewalks and was not directly concerned with the hazards created by such articles, it is at least evidence that the legislative body of the city was aware of the existence of stands like the one here involved and sanctioned their continued use. It is extremely unlikely that the city would have done so had it believed that such use involved an unreasonable risk. In any event, the importance of the press and of an efficient means of distributing newspapers among the populace of a large city are too apparent to require lengthy exposition."

Although the Majority Opinion approves the statement of Justice STEARNE that "the importance of the press and of an efficient means of distributing newspapers among the populace of a large city are too apparent to require lengthy exposition," the Majority Opinion nevertheless goes into a lengthy exposition which is not only self-contradictory, but throws the whole subject of sidewalk regulation into dire confusion.

In the eight years I have been on the Supreme Court I do not know of an Opinion which posed so many authorities in behalf of a certain position and then decided exactly to the contrary. A reading of the Majority Opinion is like watching the master of a ship who charts a course which points with unequivocal, geographical, navigational precision towards the North Pole, and then, with an arbitrariness suggestive of a shattering of the compass, decides to sail his ship in the direction of the South Pole.

The Majority Opinion, I am sorry to say, has settled nothing. On the contrary, it has opened up a Pandora's Box of problems and questions which will throw Philadelphia newsvendors into consternation, a consternation from which the public can draw no benefit and, in fact, will subject them to annoyance as well as deprivation of the right to buy their newspapers untrammeledly and freely, as becomes a city dedicated to the cause of freedom.

The Majority Opinion ends with the statement: "Since defendants do not have permission to maintain the newsstand either from the City or from the fee-owner, the maintenance of such a newsstand constitutes a trespass upon plaintiffs' property and may be enjoined." Does this mean that Manlin may maintain a newsstand in front of the Braits' property, if he gets a permit from the City, even though the Braits' object? Does this mean that if Manlin gets a permit from the City, he may monopolize the sidewalk at 46 South 52nd Street, even though he does not personally sell newspapers there? Does this mean that, possessing a City permit, he may even, as an absentee landlord, barter the rights to the sidewalk, as against the property rights of the Braits? Does the Majority Opinion mean that the owner of every property abutting on a sidewalk may now upset the newsstand in front of his property and keep away newsvendors with every force he can muster? Does the Majority Opinion mean that City Council must reenact the ordinances which are already on the books, and, if other ordinances must be passed, how are they to be worded? The Majority Opinion says that the legislative grant must be conveyed in "clear words." What are those clear words? They certainly do not appear in the Majority Opinion.

Thus, to that part of the Majority Opinion which will make a potential Donnybrook Fair of every newsstand site in Philadelphia, and possibly in other Pennsylvania cities, I vigorously dissent.

DISSENTING OPINION BY MR. JUSTICE BOK:

Mr. Justice McBRIDE prepared this dissent before his term of office expired. I told him that I would join in it. Since he has left the Court before the majority opinion was handed down, I now adopt his dissenting opinion in order that it may be filed and published. It follows:

## I.

This Court holds, quite properly it seems to me, that on the *allegations of the complaint* Brait's had an interest separate and apart from that of other citizens in the community and therefore the court below, on such allegations, had jurisdiction.

The test of jurisdiction on such a complaint is the competency of the court to determine controversies of the general class to which the case presented for its consideration belongs; whether the court has power to enter upon the inquiry, not whether it might ultimately decide that it is unable to grant the relief sought in the particular case. *Witney v. Lebanon City,* 369 Pa. 308, 85 A. 2d 106; *Zerbe Township School District v. Thomas,* 353 Pa. 162, 44 A. 2d 566; *Strank v. Mercy Hospital of Johnstown,* 376 Pa. 305, 102 A. 2d 170.

The difficulty with plaintiffs' position in this respect of the matter is that although the complaint alleged a trespass and a nuisance, its proof and the exhibits did not support such allegations and the court below, on sufficient evidence, specifically found that the maintenance of the newsstand, as reduced in size by its order, did not obstruct travel upon the sidewalk and did not materially block the display windows of Brait's store from the view of vehicular traffic.[1] Hence,

---

[1] Finding No. 20 is as follows: "20. The newsstand in its present size does not obstruct travel upon the sidewalk in front of BRAITS' establishment, and does not materially block the display windows from the view of vehicular traffic moving South on 52nd Street."

its further maintenance would constitute neither a trespass nor a nuisance. Therefore, I believe that Brait's is not in position (1) to vindicate the rights of the public under the Act of May 3, 1927, P. L. 515, §1, 17 P.S. §305 because it has not complied with the statutory procedure which is a mandatory condition precedent and (2) the findings of the court below, which we have not disturbed (even if we could), show that no private property rights of Brait's has been violated.

It would follow, therefore, that although Brait's had the right to bring the suit the court below was bound to refuse relief.

## II.

The opinion of the Court recognizes that the decree of the court below permitted "that daily Philadelphia newspapers only should be sold, the sale of out-of-town newspapers, magazines, comic books and pocket books being prohibited." In my view such a restriction is a trade regulation in violation of the commerce clause, Article I, §8, cl. 3 of the Constitution of the United States. In addition, an ordinance which so discriminates would also be invalid. *Sayre Borough v. Phillips*, 148 Pa. 482, 24 Atl. 76; *Shamokin Borough v. Flannigan*, 156 Pa. 43, 26 Atl. 780. The opinion of the Court does not decide this question as I think it must.

## III.

As I understand the opinion of the Court, it holds that if the City passes an ordinance which affirmatively regulates newsstands on sidewalks, Brait's (and others similarly situated) may not specially interfere unless the newsstand either (a) violates the ordinance, or (b) is so constructed or maintained that it constitutes a trespass upon its private property rights or is a private nuisance. If that be the correct interpretation of the opinion then I disagree with it only to the extent that it would require a new ordinance.

The Code of General Ordinances of the City of Philadelphia in §9-205 is both a penal and regulatory ordinance. It provides (subsections 3 and 5) that the display or sale of any goods, wares, or merchandise, or placing of any stands upon the sidewalks of certain named streets constitutes a *public nuisance* and penalties are provided for such offenses. Neither 52nd Street nor Chestnut Street at this point are among those named. However, under subsection 2 it is specifically provided that these provisions do not apply to "(b) the display, offering for sale and sale of books, magazines and newspapers, and the placing and maintenance of stands for such articles; . . ." It would seem clear, therefore, that the City, by a specific ordinance, has said that the maintenance of such newsstands is *not* a public nuisance. In order that the rights of public passage (not only on the named streets but all others) be safeguarded and the proper rights of abutting land owners be protected, the ordinance regulates sidewalk sales in subsection 4, as follows: "(4) No goods, wares or merchandise, by themselves or in stands, whether for sale or otherwise, may be displayed, sold or placed on any part of the sidewalk of any street so as to reduce the footway space to less than 6 feet, except as provided by regulation of the Department of Streets. (a) The Department of Streets may by regulation change the width of footway space required, but no regulation shall require more than 8 feet nor allow less than 4 feet of free footway space. (b) Sidewalk sales shall be made only at the curb line, except that with the consent of the owner of the property abutting the sidewalk they may be made at the building line of the property."[2]

---

[2] This stand, as reduced in size by the court below, even if it were not exempted as a newsstand, would not violate any of the regulatory provisions of this ordinance.

As the chancellor correctly concluded in the present case, this express exemption of newspaper sales and newsstands from the prohibition against sidewalk sales and stands constitutes a sanction by the city of the use of sidewalk *newsstands*. We are not faced in this case with the question that would arise should someone attempt to conduct a purely private business on the sidewalk, i.e., one in which the public has no substantial public interest.

The lack of special safeguards in the ordinance to protect against abuses by unreasonably large or otherwise offensive newsstands should not operate to make the ordinance's general authorization ineffective with respect to a newsstand which does *not* interfere with the public easement or the use of the abutting property owner's premises. Where a newsstand constitutes a nuisance or is a trespass upon the use of the abutting property, that can be enjoined by the courts at the instance of such property owner. An issue of that nature "necessarily depends upon the circumstances of each case." *Walnut & Quince Street Corp. v. Mills*, 303 Pa. 25, 32, 154 Atl. 29, 32 (1931), appeal dismissed 284 U. S. 573, 76 L. Ed. 498, 52 S. Ct. 16. It is time enough for the court to concern itself with that problem when the interference is shown.

The question involved in this appeal came before the Court of Common Pleas No. 7 of Philadelphia County in *Wilson v. McGill*, 42 Pa. D. & C. 74. That case decided in 1941 in favor of the defendant newsstand operator rested on the fundamental ground that a newsstand of reasonable size, properly maintained and not located so as to impede traffic, is neither a nuisance nor an unlawful trespass. In the light of this decision it is clear that at least for the past eighteen years the city has taken the position that newsstands are not in need of specific regulation or prohibition. It is not for this Court to inject itself into a matter which is essentially

legislative by a holding which would require the city to regulate where it finds that regulation is unnecessary. The Act of April 16, 1838, P. L. 626, §3, 53 P.S. §16436, left it to the City Council to regulate "as to them may seem expedient." The discretionary power to license or regulate necessarily implies the discretionary power not to license or regulate unless such failure unreasonably interferes with the public interest, thus justifying judicial interference. The fact that Chicago, because of conditions peculiar to it, has seen fit to regulate newsstands does not mean that Philadelphia, where such conditions do not exist, must do likewise unless City Council so decides.

It is obvious that the long continued custom of maintaining newsstands on the public sidewalks of Philadelphia, *fortressed* by the ordinances of the city, demonstrates that the legislative arm of city government has considered such newsstands to be appropriate to the implementation of the right of the public voluntarily to conveniently purchase each of the many editions of newspapers. The case in support of magazines, which are not as ephemeral, is not as easy but does not present such difference as would require this Court to hold that the maintenance of a newsstand for the selling of magazines together with newspapers is a nuisance or trespass but that the sale of the latter alone is not. The legislative arm of city government made no such distinction, nor should we. The public should be permitted to enjoy the public easement in a manner that will facilitate distribution of the product of the printing press, not hinder it. The judicial function is ended when it is determined that the maintenance of the newsstand is neither a trespass nor a nuisance as pleaded in the complaint.

I dissent.